**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SHAMROCK FINANCE LLC | ) | Case No. 21-10315-FJB |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF KEVIN DEVANEY IN SUPPORT OF FIRST DAY**
**MOTIONS**

1.     My name is Kevin Devaney.  I have personal knowledge of all matters averred in this Declaration, and they are all true and correct, except for those matters averred upon information and belief, and as to those matters I believe them to be true and correct.

2.     I am the sole member and manager of Shamrock Finance LLC ("**Shamrock**" or the "**Debtor**").  I make this Declaration in support of the so-called "First Day Motions" more particularly described below.  In my capacity as the sole member and manager of Shamrock, and based upon my review of relevant documents and my discussions with other members of Shamrock's management team, I am generally familiar with Shamrock's day-to-day operations, business affairs, books and record and the information appearing below.  If called upon to testify, I would testify competently to the facts as set forth in this Declaration.

3.     This Declaration is divided into three parts.  Part One of this Declaration describes the history, capital structure and other financial matters

relating to Shamrock.  Part Two summarizes what Shamrock intends to achieve in this chapter 11 proceeding, and how it intends to pay creditors.  Part Three describes the First Day Motions and the facts of which I have personal knowledge that support allowance of the First Day Motions.

## PART ONE

### A.    *Shamrock's Structure and History*

4.      Shamrock is a Massachusetts Limited Liability Company formed on March 28, 2008.  I am and since Shamrock's formation have been its sole member and manager.

5.      Shamrock is an automobile inventory "floor plan" lender that provides floorplan financing to independent car dealerships in the New England area  Dealers are primarily located in Massachusetts, with a small number in New Hampshire, Connecticut and Rhode Island.  Shamrock finances almost exclusively vehicles purchased from the major dealer only auctions.  For an additional fee, Shamrock also finances non-auction purchases, such as dealer trades or private purchases.

6.      As part of its customary financing arrangement, Shamrock requires its debtors, the independent car dealerships referenced above, to execute a Floorplan Note and Loan and Security Agreement and related documents collectively known as the Floorplan Agreement.  Pursuant to the Floorplan Agreement, the debtor grants to Shamrock a security interest in all of its assets including, but not limited to, ,  its motor vehicle inventory, consigned goods and chattel paper.  Shamrock perfects its security interest in all of its customers' assets in accordance applicable law.

2

**B.      *Shamrock's Capital Structure***

7.      I have attached as ***Exhibit A*** what I believe is an accurate balance sheet for Shamrock as of February 28, 2021.  I discuss Shamrock's liabilities and assets below.

1.    <u>**Liabilities**</u>

8.      Shamrock's liabilities largely are on account of funds it received that it uses to make floor planning loans to its customers.  Shamrock obtains capital – essentially, Shamrock's "inventory" – through loans from various individual noteholders.  For years, Shamrock has retained David Pierce, CPA ("***Pierce***") and Keith Harris, CPA ("***Harris***") as Shamrock's accountants and tax advisors.  In this capacity, Pierce and Harris solicited investments and loans into Shamrock from their respective contacts.  Contacts of Pierce and Harris generally provided Shamrock with funds pursuant to one or more notes.  While the notes differed in certain respects, generally they provided for payment of interest calculated at 12% or 13% per annum. Pierce or Harris drafted these notes – Shamrock had virtually no role in the negotiation of the terms of the notes or the drafting of the notes.  Additionally, at the insistence of Pierce and Harris, I personally signed substantially all of the notes as an additional maker or guarantor.  Shamrock then paid Pierce and Harris certain fees and other amounts calculated based upon the amounts they obtained as investments.

9.      In addition to the notes, generally Shamrock executed and delivered security agreements to the noteholders to secure the payment of the notes.  Pierce or

3

Harris drafted the security agreements – Shamrock had virtually no role in the negotiation of the terms of the security agreements or the drafting of the security agreements.  As discussed below, only a handful of noteholders recorded financing statements pursuant to Article 9 of the Uniform Commercial Code, and thus most of the security interests securing the notes are not properly perfected under applicable law.  Also as discussed below, none of the recorded financing statements describe the collateral as including accounts receivable or notes receivable – Shamrock does not believe any of its cash, therefore, is cash collateral within the meaning of 11 U.S.C. §363.

10.      Currently, Shamrock owes approximately 86 persons and their related entities approximately $17,444,233.39 in the notional amount of principal and interest as of the Petition Date of the notes.  Attached as ***Exhibit B*** is a list of the noteholders and the notional amounts of principal owed to each of them. Additionally, Pierce and Harris have disputed, contingent and unliquidated claims in unknown amounts from Shamrock on account of the loans they obtained for Shamrock from the noteholders.  Also, relatives and family members of Pierce and Harris are among the noteholders, and they hold disputed and contingent claims.

11.      For years, Shamrock has made interest payments in full and on time to its noteholders, at an aggregate interest rate of approximately twelve (12%) to thirteen percent (13%).  Due to the impact of the COVID-19 pandemic, effective April 1, 2020, Shamrock reduced the interest rate for  nearly all noteholders to nine (9.0%) or ten percent (10%).  Shamrock's goal in this bankruptcy case is to try to pay as much

4

as possible to the noteholders, who generally have been extremely supportive of Shamrock over the years.

12.     Shamrock generally is current on its operating expenses, including payroll and related expenditures.  Shamrock leases its operating facility located at 9 Turnpike Road, Ipswich, MA.  Shamrock is current on its lease obligations.  A related party is the sublessor, and Shamrock is the sublessee.  Sublease payments, however, largely are a "passthrough" and no affiliates or related entities receive any material income from Shamrock.

2.     **Assets**

13.     Shamrock's assets largely constitute its cash and what it refers to as its dealer receivables, i.e., monies Shamrock loaned to its motor vehicle dealer customers.  As of the Petition Date, Shamrock has approximately $377,614.00 in cash, excluding approximately $115,000 held in a certificate of deposit at Leader Bank, N.A. ("***Leader***") to fully collateralize a letter of credit issued by Leader for Shamrock.     Attached as ***Exhibit C*** is a redacted list of Shamrock's dealer receivables.[1]  As appears on Exhibit C, the notional amount owed to Shamrock for "active" or "performing" dealer receivables as of March 12, 2021, is approximately $9.500,934. The actual amount owed changes regularly, and significantly, as dealers

---

[1] Shamrock considers its customer list a valuable asset, and accordingly Shamrock has masked the identities of its customers.  Similarly, Shamrock has not identified its customers as "parties in interest" on its mailing matrix or other documents filed with this Court.  Among the First Day Motions filed with the Court is a motion to redact all documents filed and served in this case as applicable to conceal the identities of its customers.

5

request and receive additional advances from Shamrock and make payments to Shamrock to reduce their outstanding balances. Attached as ***Exhibit D*** is a 13 week rolling cash flow projection for Shamrock (the "***Budget***"). During the Budget period (through week ending June 12, 2021), Shamrock projects it will make principal advances to its active customers in the aggregate amount of $10,250,000.00, but will collect principal from its customers $10,650,000. Thus, although Shamrock projects that the amounts owed by its customers (its "dealer receivables") will decrease during the Budget period from $9,500,934 to $9,165,934, Shamrock also projects that its cash on hand will increase from $377,614 to $1,021,784 during that period. This activity reflects the seasonality in the motor vehicle business and the increase in purchases from dealers during the spring and summer months.

14.     Shamrock has a "contra" account (identified on the balance sheet as a "Dealer Reserve") in the approximate amount of $421,368 as of March 13, 2021, which represents the amounts paid in addition to the required principal payments when a vehicle is taken off floor plan. Not all of Shamrock's dealers have established reserves.. The amounts owed by the dealers would be reduced if, as and when Shamrock applies the particular contra account to a particular dealer receivable (often when a dealer defaults or terminates its lending relationship with Shamrock).

15.     Additionally, Shamrock has a number of customers who have defaulted on their obligations to Shamrock. Attached as ***Exhibit E*** is a list of "inactive" or "nonperforming" dealer receivables. As is apparent from Exhibit E, inactive dealer receivables are in the approximate amount of $2,980,861. The inactive dealer

receivables are in various stages of collection or litigation, as set forth on Exhibit E.

Shamrock believes its inactive dealer receivables are of speculative value.

16.    Shamrock believes it has only two other assets of consequential value.

First, Shamrock believes its customer list and goodwill with its customers is a

valuable asset.  Second, Shamrock believes it may have claims against Pierce and

Harris on account of their acts and omissions in connection with the loans to

Shamrock from its noteholders.  Shamrock continues to investigate its claims and

potential claims against Pierce and Harris and reserves all of its rights and remedies.

## PART TWO- SHAMROCK'S FUTURE

17.    Shamrock believes its current problems resulted from the excessive

number of its customers who defaulted, which impaired Shamrock's ability to pay its

noteholders.[2]  Many of these defaults were the result of the impact COVID-19

pandemic including state-wide stay-at-home orders imposed by the Commonwealth

of Massachusetts.  Shamrock intends during its chapter 11 case to negotiate a

consensual resolution of its financial issues that Shamrock intends to embody in a

chapter 11 reorganization plan.  Shamrock believes a component of its chapter 11

plan includes a required reduction in the amount of noteholder interest payments to

a level that Shamrock feasibly can pay.  After a temporary period of profitable

performance at this reduced level, Shamrock should qualify for financing that can be

used to make a substantial paydown to reduce the principal of the noteholder debt.

---

[2] For context, the amounts unpaid on account of inactive dealer receivables make it
impossible for Shamrock to continue to pay its noteholders.

Shamrock contemplates that the noteholders also would receive additional dividends after this paydown from Shamrock's operations.

18.     While Shamrock has investigated alternatives, such as a potential sale or refinancing of the noteholder debt, to date no feasible alternative has emerged, although obviously Shamrock will consider all future opportunities if any emerge. Shamrock believes the remaining alternative available to creditors – liquidation of Shamrock – would be disastrous to them.   Not only does Shamrock believe its customers would drastically reduce, if not cease entirely, payments to Shamrock on dealer receivables if Shamrock ceased operations and liquidated, those customers likely would assert substantial claims against Shamrock that would dilute the claims held by noteholders.   Even a reduced distribution to creditors would be delayed significantly while claims by and amounts owed from Shamrock's customers are addressed.   Shamrock believes creditors would incur substantial professional fees of attorneys, accountants and financial advisors whose services would be required for a prolonged period to resolve these issues in a liquidation, thereby further reducing the ultimate recovery by creditors.

## PART THREE – FIRST DAY MOTIONS

19.     To minimize any business disruption caused by the commencement of this case, Shamrock seeks various types of relief through the First Day Motion intended to facilitate the efficient administration of this case and pursue and consummate a chapter 11 plan of reorganization.   I have reviewed the First Day Motions described below, and the facts stated therein are true and correct except for

8

those facts stated upon information and belief, and as to those facts I believe them to be true and correct.

20.     I believe the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm and to all Shamrock to operate with minimal disruption during the pendency of this bankruptcy case.

21.     Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in their entireties.  The First Day Motions, with a brief summary[3] of each, are as follows:

### A.     *Bankruptcy Retention Applications*

22.     11 U.S.C. §327(a) provides that with Bankruptcy Court approval, Shamrock may employ one or more professional persons (including attorneys and accountants), that do not hold or represent an interest adverse to Shamrock's bankruptcy estate, and that are disinterested persons (as that term is defined in the Bankruptcy Code), to represent or assist Shamrock in carrying out its duties. Shamrock has filed Applications to retain the following professional persons:

    a.  Jeffrey D. Sternklar LLC (attorney) ("***JDSLLC***");

    b.  Mid-Market Management Group (business advisor) ("***MMMG***");

    c.  Verdolino & Lowey LLC (financial and tax advisor) ("***V&L***").

---

[3] The following summaries of the First Day Motions are qualified in their entireties by the First Day Motions and any evidenced adduced at any hearing to hear and determine the First Day Motions.

23.    I believe all of the professional persons identified above do not hold or represent an interest adverse to the Shamrock bankruptcy estate and are disinterested persons as defined in the Bankruptcy Code.  Among other things, none of these professional persons are creditors.  Although each has provided prepetition services to Shamrock, all of them have been paid, either in advance on account of retainers or in the ordinary course of business and in accordance with ordinary business terms.

### 1.    Retention of JDSLLC, V&L and MMMG

24.    I believe it is in the best interests of Shamrock and its bankruptcy estate that it be authorized to retain these professional persons.  Jeffrey D. Sternklar is an experienced bankruptcy attorney.  Mr. William Dewey of MMMG has extensive experience in the automobile floor planning industry, and Mr. Joseph Picano of MMMG has extensive experience as a turn-around management consultant and investment banker.  I anticipate Mr. Jalbert, of V&L, will direct Mr. Dewey and Mr. Picano to provide non-bankruptcy business advice to Shamrock as necessary.

25.    V&L will provide insolvency financial analysis and advice to Shamrock as necessary under the direction of Mr. Craig Jalbert, an experienced corporate restructuring financial advisor.  Working with Mr. Dewey, I expect V&L will be able to efficiently coordinate business opportunities with the requirements arising from this bankruptcy case.

26.    Additionally, Mr. William Hurley at V&L will direct Shamrock's tax accounting and tax preparation.  V&L will examine Shamrock's tax returns prior to

2020 and determine what, if any, amendments are required.  I have concerns about the tax preparation and accounting services provided to Shamrock by Mr. Pierce and Mr. Harris and I believe Shamrock requires V&L's tax and professional advice regarding these services as well.  Shamrock has concerns about tax returns it filed that were prepared by David Pierce, CPA and Keith Harris, CPA, its former accountants and tax preparers.

27.     For tax purposes, prior to 2016 Shamrock was a disregarded entity.  All income and losses were reported on Mr. Devaney's personal tax return.  For reasons not clear, Shamrock filed Form 2553-Election by a Small Business Corporation in 2016 to be taxed as an S Corporation. From 2016 to the present, all of Shamrock's activity has been reported on the S Corporation tax return of Shamrock. The net income or loss therefrom has then been reported on Mr. Devaney's personal tax return.  Shamrock has filed an S Corporation tax return for the years, 2016, 2017 and 2018. Shamrock has not filed its 2019 S Corporation tax return. Shamrock has also not filed its 2020 S Corporation tax return; although it has filed for an extension of time to file the 2020 tax return. The extension is valid until September 15, 2020. V&L will examine all prior tax returns filed by Mr. Devaney and Shamrock and, as necessary, advise and file amendments. V&L will also prepare and file all 2019 and subsequent tax returns for Shamrock.

**2.     Special Counsel Retention – Law Offices of James J. McNulty**

28.     11 U.S.C. §327(e) provides that Shamrock, with the court's approval, may employ, for a specified special purpose, other than to represent in in conducting

the case, an attorney that has represented it, if in the best interest of the estate, and

if such attorney does not represent or hold any interest adverse to Shamrock or to the

estate with respect to the matter on which such attorney is to be employed.

29.     Pursuant to section 327(e), Shamrock has filed an application to employ

the Law Offices of James. J. McNulty (the "***McNulty Firm***").   McNulty has

represented Shamrock as outside general counsel since January of 2014.    In

connection with such representation, it has provided Shamrock with general

corporate advice and performed other services typical of those for outside general

counsel.  McNulty also serves as an administrator and liaison to the certain outside

litigation and bankruptcy counsel retained by Shamrock, to monitor and oversee the

services provided to Shamrock by these attorneys.  Finally, McNulty has represented

Shamrock in the litigation matters identified in attached ***Exhibit A***. to the

"*Declaration of Ryan M. Tradd in Support of Application to Employ the Law Offices

of James J. McNulty as Special* Counsel" (the "***Tradd Dec.***").

30.     Shamrock seeks authority to continue to employ McNulty to represent

Shamrock as general counsel, and to continue representing Shamrock as its counsel

in the matters identified in Exhibit A.  Also, from time-to-time Shamrock calls upon

McNulty for representation in various legal matters, including claims against

defaulting customers.  McNulty seeks authority to be retained for such new matters

that may arise as which McNulty does not represent or hold any interest adverse to

Shamrock or to its bankruptcy estate with respect to such matters, without the need

for further Court approval.

12

31.    I believe the McNulty Firm does not represent or hold any interest adverse to Shamrock or to the estate with respect to the matter on which it is to be employed.  I also believe it is in the best interests of Shamrock's bankruptcy estate for Shamrock to retain the McNulty Firm to continue providing services to Shamrock. The services for which Shamrock seeks to employ McNulty as special counsel requires the assistance of qualified and able counsel.  I believe the McNulty Firm is qualified and able.  I believe Shamrock would incur substantial expense, with no concomitant benefit, if it were required to retain counsel different from the McNulty Firm to perform these services.  I do not believe Shamrock or its creditors should be saddled with this substantial expense.

32.    The McNulty Firm is small, and prompt payment of all invoices is necessary to provide the McNulty Firm with necessary cash flow.  To address the McNulty Firm's cash flow issues, Shamrock proposes to pay the McNulty Firm all undisputed amounts pursuant to invoices those attorneys issue to Shamrock on an interim basis, subject to the filing by such counsel of quarterly interim fee applications and a final fee application in appropriate form.

### B.    *Motion for Authority to Use Cash Collateral and Provide Adequate Protection*

33.    ***Liquidity is key to Shamrock – it must be able to make substantial, daily disbursements to its customers.***  The survival and success of Shamrock's business requires that it provide reliable and timely advances to its customers on account of its various floor plan arrangements.  As described in the

Budget, many of these customers request and, at Shamrock's discretion, generally receive, additional advances on their floor plan loans. ***Shamrock and its bankruptcy estate will suffer immediate and irreparable harm if it cannot continue to make advances to and for the benefit of its customers without any delay.***

34.    Shamrock requests authority to continue honoring these prepetition credit agreements with its existing active customers, and to enter into and perform floor planning arrangements with new customers, if any, in the ordinary course of Shamrock's business.  In this regard, Shamrock wishes to make advances and new loans in the ordinary course of its business, and to collect payments from its customers and apply those payments to those customers' accounts.

35.    As can be seen on the Budget, Shamrock projects it will make advances of $2,900,000 through the week ending April 3, 2021 and advances of $10,250,000 through the reporting period with the week ending June 12, 2021.  Shamrock does not believe its aggregate advances through the reporting period will exceed $10,250,000, but there could be significant deviation from week to week of the amounts advanced from the amounts projected.  These advances generally are to enable Shamrock's customers to purchase motor vehicle inventory.  Many of Shamrock's customers report that they anticipate increased sales of motor vehicles in the near term due to federal economic stimulus programs and the receipt by consumers of anticipated tax refunds in April.  Accordingly, Shamrock's estimate of its advances in any particular week is uncertain, but Shamrock has confidence in the

14

accuracy of its projected aggregate of all advances through the end of the reporting period.  For this reason, Shamrock seeks authorization to incur expenses in the amount set forth in the Budget on an aggregate basis through the end of the reporting period (week ending June 12, 2021), with a deviation of as much as twenty percent (20%) of the amounts projected in any particular week.

36.    11 U.S.C. §363(c)(1) permits Shamrock to enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.  However, 11 U.S.C. §363(c)(2) provides an exception, and prohibits Shamrock from using, selling or leasing cash collateral unless each entity with an interest in cash collateral consents or pursuant to a court order.  11 U.S.C. §363(a) defines cash collateral in pertinent part as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents."

37.    A search of the records at the Massachusetts Secretary of State's office reveals the following financing statements filed against Shamrock:

| DATE OF FILING | CREDITOR | AMOUNT OWED | COLLATERAL | NOTE |
|---|---|---|---|---|
| 09/10/2015 | Lawrence Kaplan | $710,875.00 | Legal rights of ownership(titles) in possession of debtor. All contracts & security agreements w/debtors of Shamrock Finance LLC. All cash & cash equivalents including but not limited to marketable securities of Shamrock Finance LLC | Financing Statement Lapsed |
| 03/01/2017 | DJJD, Inc. | $0.00 | Legal rights of ownership(titles) in possession of Shamrock Finance LLC, all contracts & security agreements including but not limited to rights therein with debtors of Shamrock Finance LLC and all cash and cash equivalents | No note to DJJD, Inc.  Three notes of approximately  $1,500,000 in principal are payable to Damian and Melanie Roberts, believed to be principals of DJJD, Inc. |
| 01/03/2018 | Leonard and Mary Bonfanti | $100,750.00 | No collateral described | |
| 04/22/2020 | Alfred Laustsen | $100,750.00 | Legal rights of ownership (titles) in possession of Shamrock Finance LLC.  All contracts and security agreements including, but not limited to, rights therein with debtors of Shamrock Finance LLC. All cash and cash equivalents including, but not limited to, marketable securities and insurance proceeds.  All tangible personal property, fixtures, leasehold improvements, trade fixtures, equipment and other personal property.  All products thereof and all additions and accessories thereto, substitutions therefore and replacements thereof owned by Shamrock Finance LLC. | |
| 01/25/2021 | Stephanie A. Harris | $119,388.75 | Legal rights of ownership (titles) in possession of Shamrock Finance LLC.  All contracts and security agreements including, but not limited to, rights therein with debtors of Shamrock Finance LLC.  All cash and cash equivalents including, but not limited to, marketable securities and insurance proceeds.  All tangible personal property, fixtures, leasehold improvements trade fixtures, equipment and other personal property. All products thereof and all additions and accessories thereto, substitutions therefore and replacements thereof owned by Shamrock Finance LLC. | The filing of a financing statement is an avoidable preference.  Stephanie Harris is believed to be related to Keith Harris, CPA. |

38.    As can be seen, with the possible exception of Alfred Laustsen (who claims "all contracts" as among his collateral, but as to whom Shamrock reserves all rights and defenses), I do not believe any of the secured creditors have valid or enforceable security interests in any cash collateral.  Out of an abundance of caution, however, Shamrock requests that the Court authorize Shamrock to use its cash to make advances, and to provide replacement liens to the various creditors asserting a security interest in the financing statements identified above on the same types of post-petition property of the estate against which each held purported security

interests as of the Petition Date, to the extent of any diminution in value of their respective prepetition security interests, with the same force, effect and priority, as such prepetition security interests enjoyed in Shamrock's assets, and without prejudice to Shamrock's rights to contest the amount, validity, priority and extent of any and all security interests, liens and claims.

39.     By granting the secured creditors the proposed adequate protection, the Court does not need to determine any rights of those creditors in Shamrock's cash. Since Shamrock's cash increases during the Budget period, all of the secured creditors are adequately protected by the replacement liens.

40.     Moreover, Shamrock will adequately protect the putative security interests described above by preserving the going concern value of its assets – its dealer receivables – through continued operations. As noted, Shamrock projects that the value of its cash will increase, not erode, due to continued operations. Conversely, Shamrock believes its cash would diminish rapidly in a shutdown. As noted above, Shamrock believes liquidation is disastrous for its creditors. Shamrock believe its customers would drastically reduce, if not cease entirely, payments to Shamrock on dealer receivables if Shamrock ceased operations and liquidated. Worse, Shamrock believes those customers likely would assert substantial claims against Shamrock that would dilute the claims held by unsecured noteholders and allowed deficiency claims, if any, of the secured creditors. Even a reduced distribution to creditors would be delayed significantly while claims by and amounts owed from Shamrock's customers and putative secured lenders are addressed. Shamrock believes creditors

17

would incur substantial professional fees of attorneys, accountants and financial advisors whose services would be required for a prolonged period to resolve these issues in a liquidation, thereby further reducing the ultimate recovery by creditors.

### C.  *Motion to Pay Prepetition Wages*

41.    Shamrock has five (5) employees.  Kevin Devaney is the sole member and manager of Shamrock.  Victoria Robbin is Shamrock's Chief Financial Officer. Mr. Devaney and Ms. Robbin, the only members of Shamrock's senior management, each earn a salary of $130,000 annually.  The other three employees are non-management, salaried employees.

42.    Shamrock typically pays its employees weekly in arrears on the Friday of each week.  Thus, on the Petition Date, Shamrock paid its employees for the week ending March 5, 2021.  On Friday, March 19, 2021, Shamrock pays its employees for the week ending on the Petition Date (March 12, 2021).  Shamrock's employees receive paychecks from Paychex, Shamrock's payroll service.  Shamrock typically funds the payroll by submitting to the payroll service funds to cover each week's payroll in advance, in an amount sufficient to enable full payment to employees, plus all associated taxes, earlier in the week that payment is made.

43.    Shamrock seeks authority to pay or have honored any outstanding wages, salaries and benefits owed to the Debtor's employees on the Petition Date (collectively, the "***Prepetition Wage Obligations***") in the usual and ordinary course of business.  As of the Petition Date, checks from the payroll service to employees were issued and may have been outstanding.  Although these checks were issued by

Shamrock's payroll service (Paychex) prior to the Petition Date, out of an abundance of caution, Shamrock seeks authority for the payroll service and its bank to honor these checks as they are presented for payment in the ordinary course of business. Also, Shamrock's ordinary weekly payroll for the week immediately preceding the Petition Date (week ending March 12, 2021) is scheduled to be made on Friday, March 19, 2021. Shamrock seeks authority to fund the necessary amounts with its payroll service, and authorize the payroll service and its bank to issue and honor payroll checks in the ordinary course of business. Shamrock also seeks authority in the ordinary course of business to continue to use its payroll service and meet its postpetition payroll obligations in the ordinary course of business.

44. The Prepetition Wage Obligations (inclusive of applicable taxes) Shamrock seeks to pay to its employees total as follows: (a) for the week ending March 12, 2021, payroll checks have been issued and are outstanding in the amount of $8,234.90; (b) for the week ending March 12, 2021 (payable on Friday, March 19, 2021), inclusive of payroll taxes Shamrock is required to withhold and pay to the taxing authorities, the sum of $8234,90, and (c) thereafter in accordance with the budget. With respect to the first two categories, which are the sole prepetition payroll amounts at issue, this total amount consists of accrued but unpaid wages, salaries and benefits (inclusive of applicable taxes) as of the Petition Date. Shamrock does not propose to pay any employee an amount in excess of the $13,650 priority cap set forth in Section 507(a)(4) of the Bankruptcy Code. A true and correct list of the

amounts to be paid to each employee pursuant to this motion is set forth on ***Exhibit A*** attached to that motion.

45.    As of the Petition Date, the Debtors have paid to its payroll service funds that are deducted from the employees' paychecks certain payments on behalf of payroll taxes and the employees' portions of FICA and FUTA, legally ordered wage garnishments and/or domestic support obligations, among others (collectively the "***Deductions***").  In the ordinary course of business, the Deductions are paid to third parties in accordance with applicable law.  The employee portion of the Deductions may constitute trust funds that are not property of Shamrock's bankruptcy estate.  In any case, the relevant taxing authorities would hold a priority claim under Section 507(a)(8) of the Bankruptcy Code for the tax portion of the Deductions.  As a result, creditors will not be prejudiced by the payment of the Deductions or the payment of the employer portions of the FICA and FUTA taxes associated with the prepetition payroll.  Accordingly, Shamrock requests authority to pay the Deductions in the ordinary course of its business.

46.    Shamrock also provides its employees with compensated sick time and vacation time informally, as requested, and subject to Shamrock's determination of the reasonableness of the request.  Shamrock does not pay any cash to employees for unused or abandoned sick time or vacation time.  Shamrock seeks authority to continue to honor, in the ordinary course of business, unused and reasonably requested vacation time and/or sick leave for employees.

20

47.    Shamrock pays workers' compensation insurance on behalf of its employees ("**WC Benefits**").  The Debtors seek authority to pay any prepetition amounts that may be owed on account of the WC Benefits to its worker compensation insurer, which contribution is included in the calculations of the Prepetition Wage Obligation set forth above.  The proposed payments will not exceed the statutory ceiling set forth in Section 507(a)(5) of the Bankruptcy Code.

48.    Shamrock requests authority to use Paychex existing payroll service and forms after the Petition Date so that Shamrock may continue to utilize these services and other business forms without alteration or change for the purpose of complying with the relief requested in this Motion.  Dishonor of the payroll checks from Paychex would disrupt business operations and decrease substantially employee morale.  Accordingly, Shamrock requests authority to continue to utilize Paychex and its existing account number, and to use its existing business forms without alteration or change.

### D.    *Motion to Impound*

49.    Shamrock has filed an emergency motion to impound both its customer lists and the identities and amounts payable to its employees as salary (Exhibit A to the prepetition wage motion).  I believe Shamrock's customer list is valuable.  Indeed, I believe the customer list would be the only asset of significant value that a competitor may wish to acquire in a sale.  While no competitor has offered to buy this customer list, nevertheless, in furtherance of Shamrock's fiduciary duties to creditors and its estate, redacting the identities of customers preserves the value of this

21

customer list and avoids the risk that Shamrock will inadvertently surrender this value through the disclosure in this court of its customers.  Accordingly, Shamrock seeks to impound its customer list and seeks authority to redact from any documents filed or served information that would reveal or lead to the discovery  by third parties of the identities of Shamrock's customers.  Shamrock is not seeking to exclude these customers from any service or notices it is required to send to them, but is only seeking authority to redact any and all information that would reveal or lead to the discovery by third parties of the identities of the customers.

50.    Similarly, Shamrock has filed a motion to pay prepetition wages to its employees.  Shamrock seeks authority from the Court to impound the exhibit to the wage motion that identities of its employees and the amounts payable to them as wages.  I believe disclosure of this information would expose the employees to the risk of identity theft.  Accordingly, Shamrock asks that the Court impound this exhibit.

### E.    Motion to Continue Using Existing Bank Account and Waiver of Requirements of Bankruptcy Code Section 345

51.    Shamrock currently has three accounts at Leader Bank, N.A. ("*Leader*") – an operating checking account (*1797) (the "*Account*"), a certificate of deposit securing a letter of credit issued by Leader Bank (*6104) ("the "*CD Account*") and a reserve money market account (*3952).  Shamrock intends to close the reserve money market account and deposit the money in its operating account.  The CD Account is a CD to that secures a letter of credit from Shamrock, and is not a true

account into which debits are disbursed or deposits are made.  Shamrock intends to
leave the CD in place to secure the letter of credit.

52.      All of Shamrock's receipts and disbursements are made to and from the
Account.  There is substantial and large activity in the Account occurring virtually
daily.  For example Shamrock disburses money, frequently between $100,000 -
$300,000 daily, to pay for automobile acquisitions at various automobile auctions that
it then provides to its customers and finances those automobiles.  Shamrock has
approximately 125 vendors and customers who make payments into the Account, or
receive disbursements from the Account, through ACH.

53.      Abruptly closing the Account invites widespread disarray that
inevitably will mean Shamrock's receipts will be delayed, if not lost.  Instead of
abruptly closing the Account and opening a new, debtor in possession checking
account, Shamrock proposes, and seeks authority, to open a new debtor in possession
account and gradually transfer electronic and ACH activity from the Account to the
new debtor in possession account.  Over a brief time, expected to last only until April
30, 2021, Shamrock believes it can efficiently replace ACH and wire transfer activity
from the Account to the new debtor in possession account, without significant risk of
delay or disruption in receipts or disbursements.  After terminating electronic activity
in the Account, to ensure Shamrock captures all receipts, it proposes to keep the
Account open indefinitely, but only as a collection account from which it will transfer
all receipts regularly into the new debtor in possession account, and from which it
will cease making any other disbursements.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is
true and correct. Executed on March 12, 2021

Kevin Devaney