**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| In re: | Chapter 11 |
|---|---|
| SHAMROCK FINANCE, LLC, | Case No. 21-10315 (FJB) |
| Debtor. | |

## REPORT OF THE EXAMINER

Kevin P. Clancy, in his capacity as the duly appointed examiner (the "**Examiner**") for the

Debtor, Shamrock Finance, LLC (the "**Debtor**" or "**Shamrock**"), submits this report in

accordance with the requirements of the *Agreed Order Directing the Appointment of an*

*Examiner and Resolving Motion for Appointment of Trustee* entered by this Court on April 23,

2021 [D.N. 143], as modified by this Court's *Proceeding Memorandum and Order* dated June 8,

2021 [D.N. 229], and as further modified by this Court's *Order* dated September 21, 2021 [D.N.

303] (collectively the "**Appointment Order**").

## EXECUTIVE SUMMARY

The Appointment Order directed the United States Trustee (the "**UST**") to appoint an

examiner to report to the Court on three matters:

1.     The Debtor's use of proceeds of the pre-petition promissory notes (the "**Notes**")

to 86 or more individual investors;

2.     The conduct, acts and omissions of Mr. David Pierce ("**Pierce**") and Mr. Keith

Harris ("**Harris**") relating to the Debtor, including the representations made to the individual

investors by any person in connection with the Notes; and

3.     The amounts paid and purposes for which such amounts have been paid to Pierce

and Harris in connection with the Notes.

2804956.11

Since May 5, 2021, the Examiner has pursued an investigation of the three areas of inquiry outlined in the Appointment Order.  That investigation, however, has been hampered by several key factors including, (a) the Debtor not being in possession of all of the books and records needed for the Examiner to complete his investigation, (b) what books and records the Debtor did have in its possession were internally inconsistent and incomplete, (c) the limited capabilities of the Debtor to search, filter, and/or organize the data needed by the Examiner to pursue his investigation, (d) the decision by Harris to refrain from turning over the Debtor's books and records by invoking the Fifth Amendment of the United States Constitution and Article 12 of the Massachusetts Constitution, and (e) the deadline imposed by the Appointment Order.

Notwithstanding these obstacles, the Examiner has curtailed his analysis to meet the applicable deadline and prepared this report containing his observations and findings which may be summarized as follows:

1.      The Use of Proceeds from the Notes.  While the Debtor provided the Examiner with a significant amount of data, that data did not contain a complete, verifiable, and contemporaneous record of its receipt of funds from its investors.  In June 2020, the Debtor hired Victoria Robbin as its chief financial officer and she embarked upon creating an Excel spreadsheet (the "**Investor Database**") attempting to summarize and compile information concerning the amounts invested by the investors, the date those investments were made, the payments that either were made or should have been made to the investors, and similar data covering the period from June 1, 2011 through December 31, 2020.  The Examiner was not provided with sufficient information to verify or validate the data contained within the Investor Database and, specifically with respect to the advances made by investors and the payments

2

made to the investors, was not able to reconcile that information with the Debtor's bank statements and other accounting records.

The Investor Database reveals that the investors loaned the Debtor a minimum of $18,650,195 during nearly a ten-year time period.  Based on his review of the Debtor's records made available to him, the Examiner believes that each dollar the investors loaned to the Debtor was deposited into the Debtor's operating bank account and commingled with all other revenues generated by the Debtor and all other cash deposited into that account.  These records also show that the funds deposited into the operating account (including the proceeds from the Notes contributed by the investors) during this period were used to pay all of the Debtor's expenses which included the following categories:

     a.       Payments to Pierce;

     b.       Payments to Harris;

     c.       Payments to the Debtor's principal, Kevin Devaney ("**Devaney**"), his family members, and businesses in which he had an interest;

     d.       Payments to other investors;

     e.       Loan advances to dealership customers; and

     f.       General operating expenses.

Because of the incomplete and inconsistent documents and financial data the Debtor provided to him, the Examiner is unable to conclude with certainty the exact dollar amounts spent by the Debtor on these categories of expenses during the ten-year period in which loans were made by investors to the Debtor, or of any one of those years.  In many respects, it appears that the Debtor may have left to the Examiner the job of creating the Debtor's historical books and records which would include trying to reconcile several sources of relevant financial

information.  Indeed, Ms. Robbin acknowledged that, the Debtor's "information is incomplete and does not contain every transaction generated by Shamrock.  For information prior to 2020 it would be recommended to use the bank statements and Shamrock's database management system for verification."  *See* Exhibit F, p. 3 ("*Narrative for Examiner*").

When he followed this recommendation, and began comparing the Debtor's accounting records to its bank statements, the Examiner discovered wild variations in key data points such as an $8 million difference between the cash recorded by the Debtor in its accounting system as of December 31, 2019 and the amount actually being held in its bank account on that day.  Similarly, the Debtor's accounting records fail to record nearly $300 million in cash transactions that appear in its bank statements during the period from January 1, 2015 through its bankruptcy filing.  One possible explanation for these material and substantial differences is that the Debtor simply may not have recorded the loans advanced by the investors, or the payments to them, in its accounting records.

As a result of these serious inaccuracies, the Examiner endeavored to create an accurate and complete financial record for the Debtor to analyze properly the questions presented by the Appointment Order.  Given more time, information, testimony, and other resources, the Examiner had hoped to complete his efforts to reconcile the data contained in the Debtor's two accounting systems with its bank account information.  He anticipates that any party continuing to focus on these questions would need to build upon and complete that work.

2.    <u>The Conduct, Acts, and Omissions of Pierce and Harris and the Representations Made to the Investors</u>.  The decision by Harris to refuse to provide any documents to the Examiner in response to his subpoena significantly limited the ability of the Examiner to pursue an investigation of Harris's conduct, acts, and omissions, as well as his communications with the

investors.  Similarly, although Pierce did produce a limited set of documents in response to the

Examiner's subpoena, those documents consisted largely of bank statements and did not provide

insight into Pierce's conduct, acts, and omissions relating to the Debtor or any representations he

may have made to the investors.  In addition, Pierce's spouse and Pierce's attorney represented

to the Court that Pierce was unable to testify in light of the current state of his health[1].  These

factors, combined with the cost-prohibitive nature of conducting interviews with each of the

investors, have served to impede the Examiner's investigation into Pierce's conduct, acts, and

omissions relating to the Debtor and any representations he may have made to the investors.

Nevertheless, the Examiner did obtain several copies of a document that resembles an

investment prospectus that was shared with investors.  It is unclear to the Examiner which of

Harris, Pierce, or Devaney were the authors of this document, but it appears that each of them

may have had a role in disseminating that information to investors and potential investors.  As

will be explained in detail below, that document contained one or more significant

misrepresentations of how the investors' funds would be used and the protections that such

investments would enjoy.

3.    The Amounts Paid to Pierce and Harris.  The Examiner received wildly divergent

documentation from the Debtor that makes it very difficult, if not impossible, to reach a

conclusion about how much in commissions and other payments the Debtor made to Pierce and

Harris.  Notwithstanding this hurdle, the tax returns filed by the Debtor suggest that the

aggregate figure just for the years 2016, 2017, and 2018, was $541,500.  Other records suggest

that they could have received in excess of $2 million in commissions and other fees during the

---

[1] Curiously, the Petition for *Appointment of Guardian for an Incapacitated Person* was signed by Pierce's spouse
only two weeks after the Appointment Order was entered and only one day after the Examiner was appointed.  *See
Opposition of David W. Pierce to Examiner's Motion Seeking Authority to Conduct Discovery Under
Fed.R.Bankr.P. 2004* [D.N. 228] (the "**Pierce Opposition**"), Ex. 1, pp. 2-8.

ten years leading up to the date that the Debtor filed its bankruptcy petition.  In light of the

potential claims available to the investors and/or the Debtor, the Examiner believes that further

investigation on these points is warranted.

## THE REPORT

Procedural Background.

1.      On March 12, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the United States Bankruptcy.

2.      On April 6, 2021, the UST filed the *United States Trustee's Motion for Entry of

an Order* Directing *the Appointment of a Chapter 11 Trustee* (the "**Motion for Trustee**") [D.N.

82], and alleged that:

    a.      the Debtor owed more than $17 million to at least 86 individuals for loans that

        they made to the Debtor (*see* Motion for Trustee, ¶ 2);

    b.      the Debtor relied upon Harris and Pierce to solicit these loans, but some of the

        investors assert that Devaney was also involved in their solicitation (*see id.,* ¶ 3);

    c.      the loan documentation promised the investors high returns on their investments

        and that the loans would be secured by the Debtor's assets (*see id.,* ¶ 5);

    d.      that certain investors claim to have received no prospectus containing financial

        information about the Debtor and that they also did not receive regular reporting

        or account statements from the Debtor (*see id.,* ¶ 7);

    e.      certain investors had invested their life savings with the Debtor (*see id.,* ¶ 6);

    f.      the Debtor paid Pierce and Harris a 5% annual commission based on the total

        amount of investor loans outstanding each year (*see id.,* ¶ 11);

g.      the investors may have viable claims against the Debtor, Harris, Pierce, and others

sounding in fraudulent misrepresentation and, as a result, that sufficient cause

may exist to have a trustee appointed (*see id.,* ¶ 14); and

h.      the sustained cash and accrual losses the Debtor experienced may demonstrate

incompetence and gross mismanagement in the affairs of the Debtor by its current

management and, as a result, that sufficient cause may exist to have a trustee

appointed (*see id.,* ¶ 15).

3.      The Debtor and an *ad hoc* group of creditors opposed the relief sought by the

UST and the Debtor denied the UST's allegations concerning fraud and mismanagement,

asserting that there was no basis upon which to appoint a trustee and that the appointment of a

trustee would not be beneficial to the Debtor's bankruptcy estate.

4.      The contested matter arising from the Motion for Trustee was resolved by the

compromise reflected in the Appointment Order.

5.      The Appointment Order required a report to be filed on or before June 14, 2021,

but that deadline was entered without the benefit of either the UST or Examiner having had an

opportunity to assess the state of the books and records of the Debtor.  Indeed, only the Debtor

knew at that time the disarray and lack of completeness from which its books and records

suffered.

6.      The Court approved the UST's selection of the Examiner on May 5, 2021 [D.N.

164].

7.      The Examiner's firm, CohnReznick LLP ("**CR**"), was appointed to provide

financial advisory services to the Examiner on May 28, 2021 [D.N. 203], effective as of May 5,

2021.  Riemer & Braunstein LLP ("**R&B**") was appointed to act as counsel to the Examiner on June 2, 2021 [D.N. 209], effective as of May 7, 2021.

8.      On June 2, 2021, the Examiner filed the *Consented-To Motion filed by Examiner Kevin P. Clancy to Extend Report Deadline* [D.N. 207], requesting that the deadline for him to complete his report be extended to September 14, 2021.  The grounds for the relief sought included, among other things, the need for additional time to obtain documents and testimony under oath from Harris and Pierce.  This motion was granted on June 8, 2021 [D.N. 229].

9.      On June 2, 2021, the Examiner filed the *Examiner's Motion Seeking Authority to Conduct* Discovery *Under Fed.R.Bankr.P. 2004 with Respect to Keith Harris* [D.N. 211] and the similar *Examiner's Motion Seeking Authority to Conduct Discovery Under Fed.R.Bankr.P. 2004 with Respect to David Pierce* [D.N. 212].

10.      Pierce filed an objection to the motion directed at him, asserting that he was not mentally fit to provide testimony under oath.  *See* Pierce Opposition.  Harris did not object to the motion directed at him.

11.      On June 8, 2021, the Court granted the Examiner's motions seeking to obtain documents and testimony [D.N. 230 and 231, respectively].

12.      On June 11, 2021, the Examiner served a subpoena upon Harris requesting the production of documents and electronically stored information, as well as testimony under oath. The Examiner also served a subpoena upon Pierce requesting only documents and electronically stored information.

13.      Harris objected to the Examiner's subpoena on several grounds, the primary one of which was his decision to invoke the protections against self-incrimination under the Fifth Amendment to the Constitution of the United States and Article 12 of the Massachusetts

8

Constitution². The Examiner attempted to narrow or resolve the resulting discovery dispute, but was unsuccessful and filed the *Examiner's Motion to Compel Keith Harris to Produce Documents Responsive to a Subpoena* [D.N. 251] (the "**Motion to Compel**"). After Harris objected to the Motion to Compel, the Court conducted an initial hearing on August 17, 2021, and subsequently requested further briefing. That briefing was closed on September 20, 2021 and the Motion to Compel remains under advisement.

14. Notwithstanding his objections to producing documents to the Examiner, Harris made two separate productions to the Debtor and Devaney containing, among other things, certain books and records of the Debtor that were also subject to the requests contained in the Examiner's subpoena. The Debtor has turned over that production to the Examiner and Devaney turned over a portion of the production he received from Harris.

15. As a result of the productions made by Harris to the Debtor and Devaney, the Examiner knows with certainty that Harris is in the possession, custody, or control of many documents that the Examiner sought through his subpoena, including certain of the Debtor's books and records.

Challenges Faced by the Examiner.

16. As indicated above, both CR and R&B began working to support the Examiner's investigative efforts even before their engagements were formally approved. The first step that they took in support of these efforts was to request the Debtor to provide targeted information and documentation concerning the areas of inquiry outlined in the Appointment Order. Almost immediately, that process ran into delays and difficulty.

---

² The Subpoena also required Harris to appear for an examination under oath. After Harris objected to producing any documents in response to the Subpoena, the Examiner and Harris agreed to postpone the examination until a mutually agreeable date.

17.    For example, on May 21, 2021, the Debtor advised the Examiner that it did not have, and was in the process of creating, the following sets of information:

a.    A consolidated report of payments that had been made to the investors holding the Notes; and

b.    A consolidated report of payments made to Harris, Pierce, and Devaney.  In connection with this report, the Debtor advised that it was "running into difficulty with old records."

18.    In this same communication, the Debtor advised the Examiner that it had only one tax return in its possession, custody, or control – the federal tax return for 2018 which it said might be subject to possible amendment[3].  The Examiner was also advised that the Debtor would not be turning over any of its emails to the Examiner for at least 30 days to permit the Debtor to complete a privilege review[4].

19.    Importantly, the Debtor also advised the Examiner on May 21, 2021 that it would not be providing a report to the Examiner concerning the advances made by the Debtor to dealers because "the transactions are voluminous" and "difficult to reconcile."

20.    The absence of the information pertaining to the advances made by the Debtor to the dealers presents a critical challenge for the Examiner because it was these very loans that the investors likely believed they were funding through the Notes.

21.    As will be stated in more detail below, the Examiner has concluded that all funds loaned to the Debtor from the investors were deposited into the general operating bank account of the Debtor and commingled with all other funds received by the Debtor from any source.

---

[3] It is unclear to the Examiner whether this tax return has been amended.

[4] The Examiner has been advised by Debtor's counsel that the privilege review involves more than 17,000 emails. To date, no privilege log or other written description of the undisclosed data has been produced to the Examiner.

From this operating account, the Debtor made all of its advances to dealers, but it also appears to have paid all of its other expenses including salaries, payments to Harris, Pierce, Devaney, certain companies related to the Debtor and Devaney, and the investors.

22.     With the Debtor running substantial losses in 2019 and 2020 (and all indicators pointing to losses before then as well), it is quite clear that the proceeds from the Notes were used to fund some of the Debtor's operating expenses including, without limitation, payments to Harris and Pierce, payments to other investors, and a significant volume of transactions with companies related to the Debtor and/or its principal.  Given the commingled nature of the cash in the bank accounts, the absence of more detailed, contemporaneously maintained records, and the time constraints under which he was working, the Examiner was unable to track which funds were used for what disbursements in the specific manner contemplated by the Appointment Order, despite the representations the Debtor made to the investors about the use to which their funds would be put and the protections they would enjoy.

23.     As a result, and as will be outlined in more detail below, a significant portion of the Examiner's time has been focused on reconciling the information contained in the general ledgers of the Debtor that have been made available to him so that he can determine the extent to which the proceeds from the Notes were, in fact, used for their intended purpose.

The Limitations of the Debtor's Records.

24.     On May 24, 2021, the Examiner presented the Debtor with a written request for certain additional information including the critical general ledger reports that companies typically maintain to record individual transactions and organize them within their accounting software.

25.     On May 25, 2021, the Debtor provided the Examiner with two Excel spreadsheets containing general ledger-related data covering only the period from January 1, 2020 through the Petition Date.  It subsequently advised the Examiner that the general ledgers relating to the period prior to January 1, 2020 "would be inaccurate."

26.     In an effort to follow up on his initial requests for data from the Debtor, the Examiner (through CR) made a formal request upon the Debtor (through its chief financial officer, Ms. Robbin) on May 27, 2021.   The Debtor made a substantial production of its records to the Examiner on June 3, 2021 and Ms. Robbin provided the Narrative for Examiner (Ex. F) including an explanation of certain aspects of that production and her work on the matter that included the following comments about the limitations of the Debtor's books and records:

a.      Prior to Ms. Robbin being engaged by the Debtor in June 2020, there was no "centralized database listing of all of the investors or a detailed accounting of their individual note histories."  As a result, Ms. Robbin created a database of that information based upon a schedule provided by Harris and her review of various bank statements and other documents.

b.      Ms. Robbin advised that there is "no schedule that indicates every payment to note holders for interest or note redemption," but she provided the Examiner with bank statements so that he could reconcile that information.  (The bank statements do not, however, disclose individual sources of deposits so they too must be reconciled against the promissory notes and other records of the advances by the investors using individual deposit slips, to the extent there is sufficient detail. Moreover, because the Debtor deposited all receipts from all sources into its one

12

operating bank account, the process of tracing the source of funds for any expense has been rendered difficult, if not impossible).

c.    The Debtor did not have a complete set of promissory notes and other documents needed to verify the information contained in the database Ms. Robbin created.

d.    Prior to Ms. Robbin being hired, the Debtor used the QuickBooks accounting software.  After Ms. Robbin was hired, the Debtor acquired a new accounting system, SAGE50, and attempted to convert the data contained in QuickBooks to that new system.  Ms. Robbin found the QuickBooks information to be incomplete and concluded that the best approach would be to recreate the records beginning as of January 1, 2020.  (As will be explained in more detail below, the Examiner, too, has found significant inconsistencies between the information contained in SAGE50 and QuickBooks.)

e.    With respect to the information contained in the Debtor's QuickBooks files, Ms. Robbin noted that the "information is incomplete and does not contain every transaction generated by Shamrock.  For information prior to 2020 it would be recommended to use the bank statements and Shamrock's database management system for verification."  In other words, the Debtor left to the Examiner the job of creating the Debtor's historical books and records, which would include trying to reconcile several sources of relevant financial information.

f.    The Debtor was in possession of its tax returns only for the years 2016, 2017, and 2018.

g.    The Debtor presumed that much of the missing data was in the possession, custody, or control of Harris and/or Pierce.

27.     During the Debtor's review of its emails, it became clear that the Debtor did not have either the ability or the willingness to efficiently search this electronic data for information that could be targeted to address the specific categories of information identified in the Appointment Order.  It was, therefore, agreed that the Debtor would transmit to the Examiner the entirety of its email data (not otherwise subject to the Debtor' ongoing privilege review) and that the Examiner would engage an e-discovery vendor to provide a review platform for the Examiner (and the Debtor) to process, upload, and host the data in a way that it can be searched, reviewed, and coded by the Examiner's team and the Debtor's team.

28.     On June 29, 2021, the Debtor produced approximately 21 gigabytes of data (more than 100,000 emails) and the Examiner's team has been conducting filtering and search protocols to minimize the fees and expenses associated with processing, uploading, and then reviewing this data[5].   The Debtor has advised the Examiner that thousands of emails and other documents remain subject to its ongoing privilege review (now extending to three months).  At this time, no privilege log has been produced, nor has the Debtor provided a requested summary of the nature of the communications being withheld.

The Investigation Undertaken by the Examiner.

29.     In a well-run business, the books and records that track the financial operations are captured in a general ledger system.  The data contained in the general ledger system becomes the ultimate source when the business needs to generate financial reports such as profit and loss statements, balance sheets, trial balances, and charts of accounts.  Information from the

---

[5] To facilitate the review of this data, the Examiner and the Debtor reached agreement on the engagement of an e-discovery vendor to process and host this data, and to provide assistance to both of their teams in reviewing it.  The arrangement with the e-discovery vendor includes an ongoing monthly charge for hosting the data that will continue in light of the Examiner's expectation that the Debtor, the Official Committee of Unsecured Creditors, the Office of the United States Trustee, and/or other interested parties will benefit from the data being made available.

general ledger is also used in preparing tax returns and may be used to report the status of

operations to stakeholders or outside third parties, if applicable.  Therefore, it is imperative that a

general ledger system is complete and accurate, and is supported by and reconciles to bank

statements, invoices and contractual obligations.

30.     In this case, though, the Debtor provided the Examiner with several different sets

of financials records, most of which were incomplete and many of which were inconsistent.  By

way of example, the Debtor used two different accounting systems, QuickBooks and SAGE50,

that appear to have been intended to cover different periods, but which overlapped for at least a

short period of time.  According to Ms. Robbin, QuickBooks was used by the Debtor from as

early as 2014 through at least the time that she was brought on board as the Debtor's chief

financial officer on or about June 8, 2020.  The Debtor acquired the SAGE50 system in July

2020 and began using it as of about September 1, 2020.  The Debtor claims to have used

SAGE50 to create the Debtor's definitive accounting records for 2020.

31.     Notwithstanding the Debtor's efforts to create a complete and accurate general

ledger system for the year 2020, the Debtor appears to have made no similar effort for any period

prior to that year, leaving the Examiner to piece together different sources of information to

address the questions posed by the Court in the Appointment Order.

32.     These different sources of information included the following items:

a.     Statements from the Debtor's bank accounts covering the period from January 1,

       2014 through April 30, 2021;

b.     Internal accounting records (QuickBooks and SAGE50) covering the period from

       December 31, 2014 through April 30, 2021;

c.      Investor Database concerning activity under the Notes from June 1, 2011 through

December 31, 2020; and

d.      Federal Tax Returns filed for 2016, 2017, and 2018.

33.      Where each of these sources covered different time periods, the Examiner was

frequently required to limit the data it used from one source to create a proper comparison with

information contained in another source.

34.      By way of example, when comparing the data contained in the QuickBooks and

SAGE50 accounting records to the Investor Database, the time frames they covered did not line

up exactly so the Examiner could not use any of the information in the Investor Database dating

before December 31, 2014 (the first date of the QuickBooks records) and he could not use any

information from the QuickBooks and SAGE50 records after December 31, 2020 (the last date

covered by the Investor Database).

35.      Using data from the same period helped the Examiner reveal the inconsistency

and lack of completeness evident in the Debtor's financial records.  For example, the

QuickBooks and SAGE50 records suggest that the Debtor received only $578,295 from its

investors during the period from January 1, 2015 through December 31, 2020, when the Investor

Database suggests that the investors provided funds in the amount of $12,407,695[6] during that

time as reflected in the table below and more completely in Exhibit D.

| SOURCES OF CASH ASSOCIATED WITH CAPITAL RAISING ACTIVITY | SELECTED YEARS | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2015 to 2020 |
| Per Debtor's InvestorDatabase | 1,400,000 | 2,100,000 | 3,012,695 | 1,960,000 | 3,255,000 | 680,000 | $ 12,407,695 |
| Per Debtor's Accounting System - QuickBooks & Sage | - | - | 16,195 | - | - | 562,100 | 578,295 |
| **Discrepancies** | **$ 1,400,000** | **$ 2,100,000** | **$ 2,996,500** | **$ 1,960,000** | **$ 3,255,000** | **$   117,900** | **$ 11,829,400** |

---

[6] As noted in the Executive Summary, when the entire data set is viewed in the Investor Database, it appears that the investors provided loans to the Debtor totaling $18,650,195 from June 2011 through December 31, 2020.

36.     The Examiner observed another example of the problems with the Debtor's accounting records when he analyzed the total receipts and disbursements reflected in them.  For the period covering 2015 through the Petition Date, the Debtor's bank statements reflect approximately $212.7 million in receipts and $211.9 million in disbursements.  On the other hand, the general ledger reflects approximately $60 million in receipts and approximately $67 million in disbursements, as reflected in the table below.

| SOURCES OF INFORMATION | January 2015 to April 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan-Apr 2021 | Yrs 2015-2021 |
| **Per Bank Statement - All Accounts** | | | | | | | | |
| Receipts | 15,463,044 | 26,277,883 | 34,832,226 | 35,846,719 | 42,499,580 | 40,964,452 | 16,858,258 | 212,742,162 |
| Disbursements | (14,478,503) | (26,845,906) | (34,156,692) | (35,098,860) | (41,547,689) | (43,025,976) | (16,815,521) | (211,969,148) |
| **Per QB/Sage Cash Accounts** | | | | | | | | |
| Receipts | 1,408,552 | 2,028,071 | 1,993,045 | 1,989,476 | 2,534,919 | 40,803,202 | 8,825,421 | 59,582,685 |
| Disbursements | (17,263) | (73,922) | (123,199) | (7,734,950) | (6,999,712) | (43,138,409) | (9,323,291) | (67,410,746) |
| **Discrepancies - Bank Statement vs. QB/Sage** | | | | | | | | |
| Receipts | 14,054,493 | 24,249,812 | 32,839,181 | 33,857,243 | 39,964,661 | 161,250 | 8,032,837 | 153,159,477 |
| Disbursements | (14,461,240) | (26,771,984) | (34,033,493) | (27,363,910) | (34,547,978) | 112,433 | (7,492,230) | (144,558,402) |

37.     In addition to being inconsistent with the information contained in the Investor Database, the QuickBooks and SAGE50 records do not even agree with each other.  For example, QuickBooks suggests that the Debtor had a ***negative ending cash balance*** of slightly below $5 million at the end of the day on December 31, 2019, but SAGE50 suggests that the Debtor had a ***positive beginning cash balance*** of just over $3.2 million at the beginning of the very next day as noted in the table below.

| SOURCES OF DATA | BOA A/C #0348 | LEADER A/C #1797 | TOTAL |
|---|---|---|---|
| Bank Statement - Ending Balance as of 12/31/2019 | NP | $ 3,157,953 | $ 3,157,953 |
| QuickBooks - Ending Balance as of 12/31/2019 | $ 585,520 | $ (5,580,504) | $ (4,994,984) |
| Sage - Beginning Balance as of 1/1/2020 | - | 3,240,924 | 3,240,924 |
| **Discrepancies between QuickBooks and Sage** | **$ 585,520** | **$ (8,821,428)** | **$ (8,235,908)** |

"NP" signifies "not produced" meaning that the most recent statement from the Bank of America account number ending in 0348 was for the period ending June 30, 2017.

38.     Each of the serious and material discrepancies noted in the three preceding

paragraphs highlights the inherent lack of unreliability of the Debtor's books and records.  It also

shows that, despite Ms. Robbin's efforts to take a different approach in recreating the Debtor's

books and records in 2020, the Debtor may have omitted all (or at least a significant portion) of

the investor advances, payments, and other related transactions from its books and records.

While he cannot be certain, the Examiner believes that it would take a flaw of this magnitude for

the bank statements and the QuickBooks records ***to be off by more than $8 million*** in their

claims for the level of cash maintained by the Debtor on January 1, 2020 and for the total cash

activity over the period from January 1, 2015 through the Petition Date ***to differ by***

***approximately $300 million*** from the figures shown in QuickBooks and SAGE50.

39.     As a result of the foregoing, the Examiner was required to compile a baseline of

financial information from the Debtor's books and records made available to him in order to

address the three topics outlined in the Appointment Order.  The results of these efforts are

contained and reflected in the Exhibits accompanying this report.  The purpose of each Exhibit

and the steps taken by the Examiner to create them can be described as follows:

a.     Exhibit A is a summary of payments made to Pierce and Harris by year and was

created for the express purpose of addressing the third component of the

Appointment Order to determine the amounts paid and purposes for which such

amount have been paid to them.

(i)     The Examiner created Exhibit A by identifying and compiling the

payment records contained in the Debtor's two accounting systems

(QuickBooks and SAGE50) for the period from January 2015

through April 2021, and comparing that data with certain

information contained in the tax-related workpapers produced by Harris to the Debtor during the bankruptcy case and then subsequently produced by the Debtor to the Examiner.  In addition, the Examiner performed analytical procedures to assess the reasonableness of the payments by incorporating the commission fee structure set forth in the "Shamrock Finance LLC Marketer Agreement" produced by Pierce to support his proof of claim (Claim No. 15), certain communications between Devaney and Pierce concerning those fees, and the information reported on the three tax returns of the Debtor produced to the Examiner.

(ii)    As a result of creating Exhibit A, the Examiner learned that there are significant discrepancies concerning the amounts received by Harris and Pierce when comparing the data from the Debtor's QuickBooks and SAGE50 accounting systems to the tax-related workpapers produced by Harris to the Debtor during the bankruptcy case.  Similarly, large discrepancies appear when comparing (a) the amounts that Harris and Pierce were entitled to receive under their contracts with the Debtor as applied to the principal due per the Investor Database, to either (b) the amounts reflected in QuickBooks and SAGE50 or (c) the amounts reflected in the tax-related workpapers produced by Harris to the Debtor.

b.    Exhibit B is a comparison of cash balances and aggregate receipts and disbursements by year between the external source, bank statements and the

internal source, the Debtor's accounting systems (QuickBooks and SAGE50).  It

was created for the purpose of addressing certain aspects of the second component

of the Appointment Order: evaluating of the conduct, acts, and omissions of

Pierce and Harris relating to the Debtor.

> (i)  The Examiner created Exhibit B by obtaining available bank
>
> statements from the Debtor, extracting relevant data points, and
>
> summarizing balances, receipts, and disbursements from the
>
> available bank statements to compare the aggregate amounts with
>
> those recorded in the Debtor's accounting systems (QuickBooks
>
> and SAGE50) for the period from January 2015 through April
>
> 2021.
>
> (ii)  As a result of creating Exhibit B, the Examiner learned not only
>
> that a significant portion of the Debtor's data prior to 2014 is
>
> missing, but also, for the years that records are available, there are
>
> significant discrepancies between the external records obtained
>
> from bank statements and the internal records reflected in Debtor's
>
> accounting system.  *See* paragraphs 33 through 38, above. These
>
> observations and findings lead to questions of the completeness
>
> and reliability of the Debtor's books and records.

c.    Exhibit C is a chart showing the sources and uses of cash for the period from

January 2015 through April 2021 derived from records available in QuickBooks

and SAGE50.  It was created for the purpose of addressing the first question

presented in the Appointment Order: how did the Debtor use the funds loaned to it

by the investors.

(i)     The Examiner created Exhibit C by exporting relevant accounting

ledger files from QuickBooks and SAGE50 and analyzing

transaction details relating to the Debtor's sources and uses of cash

(as presented) and organizing that data into the following

categories created by the Examiner: Capital Raising Activity with

Noteholders, Floorplan Lending Activity with Dealers, Operating

Activity, and Other Miscellaneous and Unidentified Activity.

(ii)    As a result of creating Exhibit C, the Examiner was able to further

support his conclusion that the data recorded in the Debtor's

accounting systems is incomplete and inconsistent, and therefore

its reliability is highly questionable.  Certain general ledger

accounts were not used consistently for their designated purposes.

By way of example, instead of using "Notes Payable" for

noteholders' principal investment, the Debtor used the phrase

"Accounts Payable" to describe this activity and it also used that

phrase to describe the Debtor's transactions with trade vendors.

Likewise, on the dealer side, the general ledger accounts "Notes

Receivable", "Accounts Receivable", and "Loan Receivable" were

all used for recording lending activity.  By using these commonly

understood accounting terms for purposes outside of their common

meaning, the Debtor created records that are incomplete and

21

unreliable.  Because the Examiner's work is necessarily based upon the information contained in these records, the Examiner has been cautious to note the limitations placed on his analysis and conclusions.

(iii)    Nevertheless, based on the condition of the records available, the Examiner observed that a core aspect of the Debtor's business – its ability to generate positive cash from its dealership customers – was not particularly successful.  From January 2015 through April 2021, the Debtor's positive cash flow from its dealership customers as reflected in QuickBooks and SAGE50 was only $3.1 million while also incurring $2 million in net "Operating Activity" expenses and $2.7 million in "Other Activity" expenses over the same period.  The net cash flow from dealership customers was wholly inadequate, with the logical conclusion being that the Debtor needed to use funds from the investors to meet its cash needs and still have a cash balance of $407,846 on the Petition Date[7].  Further inquiries and investigations are recommended to clarify the issues with the Debtor's books and records as well as to trace the full cycle of Shamrock's business from raising money from investors, to providing loans to and collecting fees and interest from dealers, and to paying interest and redeeming principal back to investors.

---

[7] The only other alternative is that the Debtor had one or more other sources of income that have not been disclosed to, or discovered by, the Examiner.

d.     <u>Exhibit D</u> is a Summary of Noteholders' Investment Activity for the period from

June 2011 through December 2020, and it was created to support the first

component of the Appointment Order: tracing the Debtor's use of the proceeds

from the Notes.

(i)     The Examiner created Exhibit D by reviewing Ms. Robbin's

Investor Database, capturing relevant data points from each of the

individual noteholder tabs contained within the file, including

investors' serial numbers, amounts and effective dates of original

investment, subsequent investment and redemption of principal,

rollover of compound accrued interest, and interest type, rate and

frequency of payment, and summarizing these data points by year.

In addition, the Examiner performed analytical procedures to

assess the reasonableness of the interest accrued and paid during

the period from June 2011 through December 2020.

(ii)     As a result of creating Exhibit D, the Examiner learned that

principal raised from investors during the timeframe totaled

$18,650,195 and, after taking into consideration other investor note

activity including the accrual of interest and the payments made

under the notes, as of December 31, 2020, the Debtor's Investor

Database reflects the aggregate balance of Noteholders'

Investment totaled $17,360,363, approximately $83,870 less than

what was claimed in *Declaration of Kevin Devaney in Support of

First Day Motions* [D.N. 3], but $502,651 higher than the total

amount asserted on Proofs of Claims filed by noteholders to date, and $641,491 less than the amounts reported on Schedules D, E, and F [D.N. 68].  These variances need to be investigated and explained before relying on the Investor Database as the foundation of the noteholders' investments in Shamrock.

e.    Exhibit E is entitled, Summary of Floorplan Lending Transactions with Entities Potentially Related to Devaney, and covers the period from December 31, 2014 through April 2021.  This document was created in support of addressing the first element of the Appointment Order, i.e., the Debtor's use of the proceeds from the Notes, specifically with respect to whether those funds were used to support the Debtor's operating expenses in light of the commingling of the cash received by the Debtor from all sources into one bank account.

(i)    The Examiner created Exhibit E by identifying and compiling such payment records reflected in Debtor's accounting systems (QuickBooks and SAGE50) for the period from December 31, 2014 through April 2021.  To accomplish this goal, the Examiner summarized a list of payee names from the accounting systems and conducted public research to identify entities that are potentially related to Devaney or the Debtor.

(ii)    As a result of creating Exhibit E, the Examiner learned from the year-over-year patterns of the transaction amounts that the transactions recorded prior to 2018 were significantly less than the those recorded in the subsequent years, which again indicated that

24

the Debtor's internal records are incomplete, especially during the

years in which the Debtor has asserted that Pierce and Harris were

responsible for maintaining significant portions of the Debtor's

books and records. Nevertheless, based on the available records,

the Examiner observed that the cash paid to North Shore Auto

Auction ("**NSAA**") totaled approximately $2 million for the period

from 2018 to April 2021. Therefore, further inquiries and

investigations are recommended to obtain (a) a complete set of

debtor's books and records for the floorplan lending activity, such

as the "management system" referenced in Ms. Victoria Robbin's

Narrative to the Examiner *(see* Ex. F) and the transcript from the

initial meeting of the Debtor's creditors and, (b) a more detailed

explanation of the relationship among Shamrock and the entities

described by Ms. Robbin as "Dealership" and "Auction House" as

well as other relevant third parties, and the flows of funds among.

40.     After Ms. Robbin joined the Debtor in 2020, she implemented the change in

general ledger systems from QuickBooks to SAGE50, using SAGE50 to create more accurate

and complete records for the year 2020. When converting from one general ledger system to

another, typically there are two ways to proceed: 1) migrate the historical transaction level detail

from the old system to the new system, or; 2) use the ending account balances in the old system

to create opening balances in the new system. In this situation, it appears the Debtor took neither

of these approaches but rather started off fresh as if the business was just beginning on January 1,

2020. In creating this handoff, there was a sizeable difference in the QuickBooks ending cash

accounts versus the opening cash balances in SAGE50 as reflected in the chart included in paragraph 37, above.

41.     As noted above, the general ledgers clearly do not accurately reflect the proceeds from the Notes in a very substantial way.  This being the case, the Examiner needed to look at other data sources to understand how the outstanding balances due under the Notes reached more than $18 million as of the Petition Date.  In response to the Examiner's inquiry, the Debtor produced the Investor Database that contained a significant amount of data that was not reflected in the Debtor's general ledgers.  Indeed, the general ledgers appear to have omitted the investor note activity to a very great degree.

42.     As a result, the Examiner attempted to reconcile the Investor Database transactions to the bank statements to gain a comfort level about the accuracy of the Investor Database.  While certain transactions could be found in both data sources, many could not be found because of the manner in which the Debtor commingled its deposits arising from both investor funds and funds from other operating activities, into one unsegregated bank account.  To the extent deposit slip information or other detail is available, this reconciliation exercise could result in more clarity.  Although it would be a timely and costly exercise,[8] the commingled nature of the funds and the absence of a complete and accurate general ledger likely make it necessary for a more complete understanding of what took place.

43.     During his investigation, the Examiner also became aware that one or more of the investors was provided with a prospectus, of sorts, entitled "Shamrock Finance, LLC Investment

---

[8] The Examiner is aware that the Debtor maintains approximately thirty boxes of paper records that could provide insight into these and other open questions about the accuracy and completeness of the Debtor's financial records, but a detailed review of that data was beyond scope of the Examiner's efforts in light of the time constraints he was operating under.

Opportunity"[9] in which the Debtor and/or its agent made the following representations in

soliciting the Notes [emphasis added]:

> "The proceeds from your loan will be used for the following:
> → To increase lines of credit to existing customers.
> → To extend secured revolving credit to new dealerships.
> ***The proceeds from your loan will not be used to pay for any operating expenses***."

44.    The above-quoted representations vary slightly in different versions of the

investment prospectus discovered by the Examiner, but each version asserts that, "Your funds

will always be backed by cash in the bank and or, dealer notes receivables or a combination of

both."  They also assert that, "The promissory note(s) will be secured by all assets of the

Company and the personal guarantee of its managing member."

45.    In at least one version of the Investment Opportunity it used to solicit

investments, the Debtor told potential investors that their funds would only be used to fund loans

to the Debtor's dealership customers.  In each version of the Investment Opportunity that the

Examiner has reviewed, the Debtor also advised would-be investors that their funds would not be

used to pay operating expenses.

46.    From these statements, a reasonable investor might conclude that their funds

would be placed in a segregated account and used only for specific purposes.  That conclusion,

however, would be entirely incorrect because the Debtor had only one bank account at any given

time, into which it would deposit all funds it received.  The monies advanced by the investors

would, therefore, be commingled with the payments made by the Debtor's dealership customers

and all other revenues and funds received by the Debtor.  And from that account, the Debtor

would pay all of its expenses.

---

[9] A copy of the Investment Opportunity document provided to the Examiner by counsel to investor Roy Hayward is annexed to this report as Exhibit G.  Other versions of this document were also included in the Debtor's email data.

## RESULTS OF THE EXAMINER'S ANALYSIS

Question 1 - How did the Debtor use the proceeds from the Notes?

47.    As demonstrated above, all of the investors' funds were commingled with all other deposits received by the Debtor.  As a result, the Examiner could not simply trace the flow of investor funds from one account to the next.  Instead, he was required to dig more deeply into how all of the cash flowed in and out of the Debtor's operating bank account so he could then attempt to extrapolate the data relating to the Notes.

48.    To accomplish this task, and as a critical starting point in initiating the overall investigation, the Examiner needed to gain an understanding of the reliability of the Debtor's books and records, including the general ledgers that should capture the financial transactions of the Debtor's business over time, in this case several years.  A key step in evaluating the general ledgers is to compare the activity in the ledger cash accounts to the activity in the bank statements.  Based on this analysis, the Examiner concluded there were considerable differences between the general ledger cash accounts and the bank account activity.  In this regard, the Examiner makes the following observations:

a.    In any given year, the Debtor had two primary sources of cash:

(i)    payments from its dealership customers for fees, interest, and other charges, and

(ii)    the advances made by the investors.

Quite simply, this means that if the funds from dealership customers were insufficient to pay the Debtor's operating expenses, then the funds from the investors necessarily made up the difference despite the fact that the investors were explicitly told that their funds would not be used to pay operating expenses.

b.       The Examiner also concluded there were considerable differences between the

general ledger cash accounts and the bank account activity.  For example, for the

period January 1, 2015 through the Petition Date, the Debtor's bank statements

reflect approximately $212.7 million in receipts and $211.9 million in

disbursements.  On the other hand, the general ledger reflects approximately $60

million in receipts and approximately $67 million in disbursements. *See* ¶ 36,

above, and the accompanying table.

c.       During this same period the QuickBooks and SAGE50 records reveal that the

Debtor incurred the following categories of expenses:

(i)       Payments to Harris in the amount of $292,749;

(ii)      Payments to Pierce in the amount of $791,813;

(iii)     Payments to Devaney and what are presumed to be his family

members in the amount of $45,520;

(iv)     Payments to Devaney-related businesses in the amount of

$2,122,790;

(v)      Payments to non-insider noteholders in the amount of $5,580,424;

(vi)     Operating Expenses in the amount of $2,009,260;

(vii)    Bad Debt and Bill Adjustments in the amount of $3,029,717[10]; and

(viii)   Other Miscellaneous and Unidentified Activity in the amount of

$1,659,906.

*See* Exhibit C.  These figures total $15,532,179 a sum that greatly exceeds by

nearly 500% the $3.1 million in net cash flow generated by the Debtor's lending

---

[10] While the items described in sub-paragraphs (vii) and (viii) are not ordinarily treated as cash expenses, it appears
to the Examiner that these items did, in fact, reflect actual cash expenses.

operation with its dealership customers during the covered time period. This
mathematical exercise strongly suggests that the investor funds were used to pay
these expenses.

49.     Stated differently, after determining that the Debtor's cash was commingled, and
having established that sizeable discrepancies existed between what was recorded in the general
ledgers and the Debtor's bank accounts, the Examiner attempted to summarize the financial
information in the general ledgers to determine if the information, although incomplete, could
shed any light on how the Note proceeds might have been utilized by looking at the general
ledger transactions. Exhibit C lays out by year in certain categories the dollars reflected in the
general ledgers. The most interesting takeaway is that when one looks at net activity derived
from the "Floorplan Lending Activity" during the period from 2015 through the Petition Date,
the cash derived from the Debtor's core lending business was approximately $3.1 million.

50.     When you contrast this figure against *"Operating and Other Activity,"* which on a
net basis for the same period totals approximately $4.7 million, then the $3.1 million from the
Floorplan Lending Activity is not enough to cover this set of expenses. To the Examiner, this
clearly means that the deficit of approximately $1.7 million would have to have been covered
from another source (i.e., the investors). As mentioned earlier, however, Exhibit C also reflects
that only approximately $600,000 was received from *"Capital Raising Activity,"* which clearly
could not have reflected what actually occurred with the investors and the Notes.

51.     The Examiner also took note of significant payments being made to NSAA that
appears to have been little more than another name under which Devaney conducted business for
an undisclosed period of time.

52.     While the Debtor's business model was premised upon providing loans to used car dealerships, the Debtor did not typically make its advances to the dealers directly.  Instead, the dealerships would arrange to acquire their inventory at auction and, after conducting whatever due diligence the Debtor deemed appropriate, the Debtor would make advances to the dealers by paying the auction houses directly to fund the auction purchases.

53.     NSAA appears to have been an auction house run by Mr. Devaney and to which the Debtor appears to have directed more than $2 million during 2019 and 2020[11].  These figures were derived from the Debtor's QuickBooks records and, as with the other figures discussed above, could not readily be verified by the Debtor's bank statements.  Moreover, the Examiner is unable to determine whether the Debtor's funding of $2 million of automobile purchases from Devaney represented anything untoward.  The records the Debtor supplied to the Examiner did not reveal that level of detail.

54.     The Examiner also attempted to verify the amounts due and owing on the Notes. This was a way to work backwards to try to confirm the amount of Note proceeds the Examiner was tasked with tracing.  The chart below compares the Note balances from several different sources: the Devaney Declaration, the amounts from Schedules D, E & F, the proofs of claim filed by the investors, and the Investor Database.  Although relatively close in amounts there are discrepancies, both in number of investors and the dollar amounts.  The Examiner has made note that the Investor Database seems to include the most useful and detailed activity, with the caveat the activity still needs to be reconciled to some independent source or another reliable data source.  Please see Exhibit D for a summary of the activity from the Investor Database.

---

[11] Early in his investigation, the Examiner found clear evidence on various internet and social media sites linking NSAA to Devaney as reflected in Exhibit H. Through counsel, the Examiner requested confirmation from the Debtor that Devaney was linked to NSAA.  Counsel confirmed that fact, but the evidence referenced in the preceding sentence appears to have been removed from public view.

31

| POTENTIAL INSIDER | Adversary Proceeding Exhibit A | Devaney Declaration [D.N. 3] | Schedules D/E/F [D.N. 68] | Proof of Claim Filed by Creditor | Debtor's InvestorDatabase ("Investor DB") | | | Discrepancies | | |
| | Count # | Outstanding Amount $ | Scheduled Amount $ | Asserted Amount $ | Investment Balance $ | Interest Accrued thru 12/31/2020 | Total as of 12/31/2020 | Devaney Declar. vs. Sch D/E/F | Devaney Declar. vs. Proof of Claim | Devaney Declar. vs. Investor DB |
|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total - Amount $ | None | $ 17,444,233 | $ 18,001,853 | $ 16,857,711 | $ 16,304,664 | $ 1,055,699 | $ 17,360,363 | $ (557,620) | $ 586,522 | $ 83,871 |
| Grand Total - Count # | 91 Lines | 107 Lines | 184 Schedules | 83 Filed Claims | | | 131 Lines | | | |

<u>Question 2 – What Representations were made by Pierce and Harris to the Investors and What Actions and Omissions did they take with respect to the Investors</u>?

55.    The Investment Opportunity (*see* Exhibit G) documents provided by an investor and contained within the mass of emails produced by the Debtor are the best evidence available to the Examiner concerning the representations likely made by Pierce and Harris (and Devaney) to the investors.

56.    The decision by Harris to refuse to provide any documents to the Examiner in response to his subpoena significantly limited the ability of the Examiner to pursue an investigation of Harris's conduct, acts, and omissions, as well as his communications with the investors.

57.    The Motion to Compel remains pending before the Court and (a) the Examiner's ability to conduct an effective examination under oath of Harris prior to that ruling, (b) the Examiner's expectation that Harris would refuse to provide substantive responses to any examination under oath, (c) the cost-prohibitive nature of conducting interviews with each of the 86 or more investors, and (d) the deadline for this report, have combined to prevent the Examiner from assessing Harris's conduct, acts, and omission relating to the Debtor or any representations he may have made to the investors.

58.    While Pierce did produce a limited set of documents in response to the Examiner's subpoena, those documents consisted largely of bank statements and did not provide insight into Pierce's conduct, acts, and omission relating to the Debtor and any representations he

may have made to the investors.  In addition, Pierce's spouse and Pierce's attorney represented
to the Court that Pierce was unable to testify in light of the current state of his health.

59.     These factors, combined with the cost-prohibitive nature of conducting interviews
with each of the investors, have served to impede the Examiner's investigation into Pierce's
conduct, acts, and omission relating to the Debtor and any representations he may have made to
the investors.

60.     Nevertheless, the Investment Opportunity documents clearly point to key
misrepresentations made to the investors:

a.      That their funds would not be used to pay the Debtor's operating expenses; and

b.      That their funds would be protected to one degree or another by a security interest
        in certain assets.

61.     If the Debtor's books and records are to be relied upon to any degree, these
statements clearly cannot be true.

62.     Notwithstanding this clear conclusion, the Examiner's investigation did not reveal
(a) how many investors were provided with this document or similar documents containing these
statements, (b) who prepared these documents, or (c) whether Pierce, Harris, Devaney, and/or
other agents of the Debtor were the people who distributed the document.

Question 3 – How much did the Debtor pay to Pierce and Harris?

63.     Based upon the documents made available to the Examiner, the Debtor appears to
have been contractually bound to pay Pierce and Harris an annual commission of 5% of the
outstanding amount of investor Notes they had generated.   To be clear, this was not a one-time
fee paid at the loan closing, but was instead intended to be paid to Pierce and Harris each year on
the total amount outstanding under the Notes they solicited.  It is entirely unclear, however,

whether this formula was honored by the Debtor (it could have resulted in more than $650,000 in commissions being paid to them during each of the three years leading up to the Petition Date). The Examiner reviewed documents suggesting that the Debtor unilaterally capped the annual aggregate commission to be paid to Harris and Pierce at $180,000 beginning in late 2014.

64.     As described above, the financial records provided to the Examiner were internally inconsistent and admittedly incomplete.   For example, QuickBooks and SAGE50 suggest that Pierce received payments in the aggregate of $775,000 during 2018, 2019, and 2020 and nothing before that period, but the Debtor produced tax-related work-papers suggesting that he was paid approximately $1.6 million during the period from 2012 through 2019[12].   Similarly, QuickBooks suggests that Harris received payments totaling $200,000 in 2018 alone, but the Debtor's tax-related work-papers suggest that he received only $17,000 that year.   In addition, the Debtor's tax returns for each of the years 2016, 2017, and 2018, and 2019 suggest that Pierce and Harris received a total of $180,000 each year for their commissions[13].   Nevertheless, because (a) none of these accounting records can be reconciled with the Debtor's bank statements (or each other), (b) Harris refused to produce documents (and, presumably testify) concerning the amounts he received from the Debtor, and (c) Pierce claims to be unable to testify about the payments, the Examiner is unable to conclude definitively how much was received by Pierce and Harris.

---

[12] The 1099 data referenced above appears to have been produced by Harris to the Debtor during the bankruptcy case, with the Debtor then turning it over to the Examiner.  Please see Exhibit A for a complete analysis of these figures.

[13] The $180,000 in the tax returns are identified as "Marketer Fees" which the Examiner presumes to refer to Harris and Pierce, consistent with the agreements reviewed by the Examiner and the decision in 2014 of the Debtor to cap their annual commissions at $180,000 per year based on a December 1, 2014 email from Devaney to Pierce.

**CONCLUSIONS**

65.     In light of the analysis described above, the Examiner concludes that there are

serious deficiencies in the books and records that prevent the Examiner from providing specific

dollar figure responses to the narrow questions presented in the Appointment Order.  The

Examiner is not in a position to conclude whether these records were in this condition because

the Debtor was not capable of maintaining accurate books and records of its daily activities or

whether it did so negligently or intentionally.

66.     Notwithstanding these deficiencies, the Examiner also concludes that there were

misrepresentations contained in the various "Investment Opportunity" documents that were

shared with at least one investor who was solicited by Devaney and that appear to have been

prepared for and distributed to other investors.  These documents stated that the investor funds

would be used only for specific purposes and would not be used for other purposes.  However,

these funds were all placed into the only operating bank account maintained by the Debtor at any

given time, commingled with all of the Debtor's other funds and used to pay the operating

expenses of the Debtor, NSAA, and other investors.  In the absence of testimony from Harris,

Pierce, Devaney, and/or the investors to whom the representations were made, the Examiner is

unable to conclude that these misrepresentations were intentional and/or actionable.

67.     If the QuickBooks information concerning the NSAA transactions are an accurate

portrayal of events, the Debtor made in excess of $2 million in payments to or for the benefit of

Devaney during the two years prior to the Petition Date.  The Examiner is not able to determine

whether these payments were (or were not) made in exchange for reasonably equivalent value.

68.     To the extent that they can be relied upon, the QuickBooks and SAGE50 records

for the period from January 1, 2015 through on or about the Petition Date reveal that the Debtor

made payments to Harris in the amount of $292,749 and payments to Pierce in the amount of

$791,813.  The Debtor's tax returns made available to the Examiner reveal different figures including $541,500 paid as "Marketer Fees" in the aggregate during the three years between and including 2016 and 2018.

69.     The Examiner and his professionals can be available to address any questions the Court or parties-in-interest may have about this report.  The conclusions contained herein are based on the information currently available to the Examiner and he reserves the right to amend and/or supplement the conclusions to the extent any additional information becomes available.

Respectfully Submitted,

Dated: October 5, 2021

*/s/ Kevin P. Clancy*
Kevin P. Clancy, Examiner
Global Director
Restructuring and Dispute Resolution Services
Transactions & Turnaround Advisory
CohnReznick LLP
14 Sylvan Way, 3rd Floor
Parsippany, New Jersey 07154
732.635.3108
Kevin.Clancy@CohnReznick.com

2804956.1

36

# Exhibits

**EXHIBIT A – PAYMENTS TO PIERCE AND HARRIS**

| SOURCES OF INFORMATION | YEARS IN SCOPE | | | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan-Apr 2021 | |
| **PAYMENTS TO PIERCE** | | | | | | | | | | | | |
| Per QuickBooks | NP | NP | NP | NP | $ - | $ - | $ - | $ 228,000 | $ 285,000 | NE | NE | $ 513,000 |
| Per Sage | NP | NP | NP | NP | NE | NE | NE | NE | NE | 261,938 | 16,875 | 278,813 |
| Total per Debtor's Accounting System | NP | NP | NP | NP | - | - | - | 228,000 | 285,000 | 261,938 | 16,875 | 791,813 |
| Total Per Harris' Workpapers | - | 9,546 | 159,803 | 235,117 | 252,000 | 262,000 | 78,000 | 286,500 | 307,000 | NP | NP | 1,589,965 |
| Discrepancies | NA | NA | NA | NA | $ (252,000) | $ (262,000) | $ (78,000) | $ (58,500) | $ (22,000) | NA | NA | (798,153) |
| **PAYMENTS TO HARRIS** | | | | | | | | | | | | |
| Per QuickBooks | NP | NP | NP | NP | $ 1,148 | $ - | $ 21,583 | $ 201,250 | $ 51,970 | NE | NE | $ 275,950 |
| Per Sage | NP | NP | NP | NP | NE | NE | NE | NE | NE | 16,611 | 188 | 16,799 |
| Total per Debtor's Accounting System | NP | NP | NP | NP | 1,148 | - | 21,583 | 201,250 | 51,970 | 16,611 | 188 | 292,749 |
| Total Per Harris' Workpapers | 700 | 4,540 | 5,249 | 16,225 | 12,078 | 10,400 | 90,298 | 17,220 | 49,850 | NP | NP | 206,560 |
| Discrepancies | NA | NA | NA | NA | $ (10,930) | $ (10,400) | $ (68,716) | $ 184,030 | $ 2,120 | NA | NA | 86,189 |
| **TOTAL PAYMENTS TO PIERCE AND HARRIS** | | | | | | | | | | | | |
| Total per Debtor's Accounting System | NP | NP | NP | NP | 1,148 | - | 21,583 | 429,250 | 336,970 | 278,549 | 17,063 | 1,084,562 |
| Total Per Harris' Workpapers | 700 | 14,086 | 165,052 | 251,342 | 264,078 | 272,400 | 168,298 | 303,720 | 356,850 | NP | NP | 1,796,526 |
| Discrepancies | NA | NA | NA | NA | (262,930) | (272,400) | (146,716) | 125,530 | (19,880) | NA | NA | (711,964) |

| ESTIMATED COMMISSION TO PIERCE/HARRIS PER MARKETER AGREEMENT AND OTHER CORRESPONDENCE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Principal Balance, before Interest Rollover & Redemptions | | 113,500 | 1,504,500 | 4,501,500 | 5,916,500 | 7,180,067 | 9,197,993 | 11,941,044 | 13,743,540 | 16,602,664 | 16,304,664 | NP |
| Estimated Commission at 5% | | 5,675 | 75,225 | 225,075 | 295,825 | 359,003 | - | - | - | - | - | NP | 960,803 |
| Re-negotiated Flat Fee per Tax Returns | | - | | | | | 181,500 | 180,000 | 180,000 | 180,000 | NP | NP | 721,500 |
| **Total Estimated Commission** | | $ 5,675 | $ 75,225 | $ 225,075 | $ 295,825 | $ 359,003 | $ 181,500 | $ 180,000 | $ 180,000 | $ 180,000 | NP | NP | $ 1,682,303 |

**EXHIBIT B – COMPARISON OF CASH BALANCES AND TOTAL RECEIPTS & DISBURSEMENTS**

| SOURCES OF INFORMATION | | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan-Apr 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per Bank Statement - All Accounts** | [a] | | | | | | | | | | | | |
| Beginning Balance | [a] | NP | NP | NP | $ 819,986 | $ 366,151 | $ 1,350,693 | $ 782,670 | $ 1,458,203 | $ 2,206,062 | $ 3,157,953 | $ 1,221,803 | $ 945,360 |
| Receipts | [b] | NP | NP | NP | 17,219,700 | 15,463,044 | 26,277,883 | 34,832,226 | 35,846,719 | 42,499,580 | 40,964,452 | 16,858,258 | 229,961,861 |
| Disbursements | [b] | NP | NP | NP | (17,673,534) | (14,478,503) | (26,845,906) | (34,156,692) | (35,098,860) | (41,547,689) | (43,025,976) | (16,815,521) | (229,642,682) |
| Ending Balance | | NP | NP | NP | $ 366,151 | $ 1,350,693 | $ 782,670 | $ 1,458,203 | $ 2,206,062 | $ 3,157,953 | $ 1,096,428 | $ 1,264,539 | 1,264,539 |
| **Per QB/Sage Cash Accounts** | [c] | | | | | | | | | | | | |
| Beginning Balance | [c] | NP | NP | NP | NP | NP | $ 1,391,288 | $ 3,345,437 | $ 5,215,284 | $ (530,191) | $ (4,994,984) | $ 905,716 | $ - |
| Discrepancies from QB to Sage conversion | | | | | | | | | | | 8,235,908 | | 8,235,908 |
| Receipts | | NP | NP | NP | NP | 1,408,552 | 2,028,071 | 1,993,045 | 1,989,476 | 2,534,919 | 40,803,202 | 8,825,421 | 59,582,685 |
| Disbursements | | NP | NP | NP | NP | (17,263) | (73,922) | (123,199) | (7,734,950) | (6,999,712) | (43,138,409) | (9,323,291) | (67,410,746) |
| Ending Balance | [c] | NP | NP | NP | NP | 1,391,288 | 3,345,437 | 5,215,284 | (530,191) | (4,994,984) | 905,716 | 407,846 | 407,846 |
| **Discrepancies - Bank Statement vs. QB/Sage** | | | | | | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan-Apr 2021 | Yrs 2015-2021 |
| Beginning Balance | | NA | NA | NA | NA | NA | $ (40,595) | $ (2,562,768) | $ (3,757,080) | $ 2,736,253 | $ 8,152,937 | $ 316,086 | NA |
| Receipts | | NA | NA | NA | NA | 14,054,493 | 24,249,812 | 32,839,181 | 33,857,243 | 39,964,661 | 161,250 | 8,032,837 | 153,159,477 |
| Disbursements | | NA | NA | NA | NA | (14,461,240) | (26,771,984) | (34,033,493) | (27,363,910) | (34,547,978) | 112,433 | (7,492,230) | (144,558,402) |
| Ending Balance | | NA | NA | NA | NA | $ (40,595) | $ (2,562,768) | $ (3,757,080) | $ 2,736,253 | $ 8,152,937 | $ 190,712 | $ 856,692 | $ 856,692 |

**SOURCES:**

(1) Bank Statements

(2) Debtor's internal Accounting Systems: QuickBooks ("QB") and Sage

**LEGEND & NOTES:**

"NP" - Activities, transactions or records may have existed; Examiner was not provided with the relevant data and documentation to review.

"NE" - Activities, transactions or records do not exist.

"NA" - Calculation or assessment of discrepancies does not apply due to lack of comparable data.

[a] - Includes all bank accounts provided for years from 2014 through 2020; refer to EXHIBIT B-1 for a breakdown of the consolidated activities and balances.

Aggregate beginning balance of $945,360 consisted of the balances from BOA #0348 as of 2014 and Leader Reserve #3952 and Leader CD #6104 balances as of 2021 as their statements prior to 2021 are not provided.

### EXHIBIT B-1 – BREAKDOWN OF CASH ACTIVITIES AND BALANCE BY BANK ACCOUNT

| SOURCES OF INFORMATION | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan-Apr 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per Bank Statement – BOA #0348** [a] | | | | | | | | | | | | |
| Beginning Balance | NP | NP | NP | $ 819,986 | $ 366,151 | $ 1,350,693 | $ 782,670 | NP | NP | NP | NP | $ 819,986 |
| Receipts | NP | NP | NP | 17,219,700 | 15,463,044 | 26,277,883 | 10,495,407 | NP | NP | NP | NP | 69,456,033 |
| Disbursements | NP | NP | NP | (17,673,534) | (14,478,503) | (26,845,906) | (11,278,077) | NP | NP | NP | NP | (70,276,019) |
| Ending Balance [b] | NP | NP | NP | $ 366,151 | $ 1,350,693 | $ 782,670 | $ - | NP | NP | NP | NP | |
| | | | | | | | | | | | | |
| **Per Bank Statement – Citizens Operating #1712 (DIP)** | | | | | | | | | | | | |
| Beginning Balance | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | $ - | $ - |
| Receipts | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | 436,963 | 436,963 |
| Disbursements | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | (161,474) | (161,474) |
| Ending Balance | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | 275,489 | 275,489 |
| | | | | | | | | | | | | |
| **Per Bank Statement – Citizens Payroll #1852 (DIP)** | | | | | | | | | | | | |
| Beginning Balance | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | $ - | $ - |
| Receipts | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | 100 | 100 |
| Disbursements | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | - | - |
| Ending Balance | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | 100 | 100 |
| | | | | | | | | | | | | |
| **Per Bank Statement – Leader Operating #1797** | | | | | | | | | | | | |
| Beginning Balance | NE | NE | NE | NE | NE | | $ - | 1,458,203 | 2,206,062 | 3,157,953 | 1,096,428 | $ - |
| Receipts | NE | NE | NE | NE | NE | | 24,336,819 | 35,846,719 | 42,499,580 | 40,964,452 | 16,421,052 | 160,068,622 |
| Disbursements | NE | NE | NE | NE | NE | | (22,878,616) | (35,098,860) | (41,547,689) | (43,025,976) | (16,654,047) | (159,205,189) |
| Ending Balance | NE | NE | NE | NE | NE | | $ 1,458,203 | 2,206,062 | 3,157,953 | 1,096,428 | 863,433 | 863,433 |
| | | | | | | | | | | | | |
| **Per Bank Statement – Leader Reserve #3952** [c] | | | | | | | | | | | | |
| Beginning Balance | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | $ 11,376 | 11,376 |
| Receipts | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | 2 | 2 |
| Disbursements | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | - | - |
| Ending Balance | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | 11,378 | 11,378 |
| | | | | | | | | | | | | |
| **Per Bank Statement – Leader CD #6104** [c] | | | | | | | | | | | | |
| Beginning Balance | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | $ 113,999 | 113,999 |
| Receipts | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | 141 | 141 |
| Disbursements | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | - | - |
| Ending Balance | NP | NP | NP | NP | NP | NP | NP | NP | NP | NP | 114,139 | 114,139 |
| | | | | | | | | | | | | |
| **Per Bank Statement – All Accounts** [c] | | | | | | | | | | | | |
| Beginning Balance | NP | NP | NP | $ 819,986 | 366,151 | 1,350,693 | 782,670 | 1,458,203 | 2,206,062 | 3,157,953 | 1,221,803 | $ 945,360 |
| Receipts | NP | NP | NP | 17,219,700 | 15,463,044 | 26,277,883 | 34,832,226 | 35,846,719 | 42,499,580 | 40,964,452 | 16,858,258 | 229,961,861 |
| Disbursements | NP | NP | NP | (17,673,534) | (14,478,503) | (26,845,906) | (34,156,692) | (35,098,860) | (41,547,689) | (43,025,976) | (16,815,521) | (229,642,682) |
| Ending Balance | NP | NP | NP | $ 366,151 | 1,350,693 | 782,670 | 1,458,203 | 2,206,062 | 3,157,953 | 1,096,428 | 1,264,539 | 1,264,539 |

[b] - Representing total cash in-flows and out-flows, inclusive of inter-account transfers if any.

[c] - Obtained from QuickBooks records for 2015 through 2019, and Sage records for 2020 through April 2021. Per Debtor, the accounting system was converted from QuickBooks to Sage in 2020. However, the ending balance as of 12/31/2019 in QB do not agree with the beginning balance as of 1/1/2020 in Sage, as summarized in the table below:

## EXHIBIT C – SOURCES AND USES OF CASH

### YEARS IN SCOPE

| CASH ACTIVITY CATEGORIES | | 2011-2014 SOURCES | USES | NET | 2015 SOURCES | USES | NET | 2016 SOURCES | USES | NET | 2017 SOURCES | USES | NET | 2018 SOURCES | USES | NET |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | [a] | | | [a] | | | | | | | | | | |
| Cash at Beginning of Year per QB - Surplus/(Deficit) | [b] | | | NP | | | NP | | | 1,391,288 | | | 3,245,437 | | | 5,215,284 |
| Discrepancies between QB and Sage | [b] | | | | | | | | | | | | | | | |
| Cash at Beginning of Year per Sage - Surplus/(Deficit) | | | | | | | | | | | | | | | | |
| **Capital Raising Activity** | | | | | | | | | | | | | | | | |
| Non-insider Noteholders | | NP | NP | NP | - | (9,600) | (9,600) | - | (73,922) | (73,922) | 16,195 | (101,514) | (85,318) | - | (1,072,853) | (1,072,853) |
| Insider Noteholders: | | | | | | | | | | | | | | | | |
| Devany & Family Members | | NP | NP | NP | - | (812) | (812) | - | - | - | - | - | - | - | (5,808) | (5,808) |
| Pierce & Family Members | | NP | NP | NP | - | - | - | - | - | - | - | - | - | - | (228,000) | (228,000) |
| Harris & Family Members | | NP | NP | NP | - | (1,148) | (1,148) | - | - | - | - | (21,583) | (21,583) | - | (201,250) | (201,250) |
| Subtotal - Capital Raising Activity | [c] | NP | NP | NP | - | (11,559) | (11,559) | - | (73,922) | (73,922) | 16,195 | (123,096) | (106,901) | - | (1,507,911) | (1,507,911) |
| **Floorplan Lending Activity** | | | | | | | | | | | | | | | | |
| Non-Devaney related Entities | | NP | NP | NP | 1,390,099 | - | 1,390,099 | 2,024,414 | - | 2,024,414 | 1,973,331 | - | 1,973,331 | 1,916,824 | (1,762,527) | 154,297 |
| Devaney related Entities | [d] | NP | NP | NP | 4,924 | - | 4,924 | 3,657 | - | 3,657 | 3,519 | - | 3,519 | 5,836 | (74,100) | (68,264) |
| Subtotal - Floorplan Lending Activity | | NP | NP | NP | 1,395,023 | - | 1,395,023 | 2,028,071 | - | 2,028,071 | 1,976,850 | - | 1,976,850 | 1,922,660 | (1,836,627) | 86,033 |
| **Operating Activity** | | | | | | | | | | | | | | | | |
| Legal & Financial Professional Fees | | NP | NP | NP | - | (2,301) | (2,301) | - | - | - | - | - | - | - | (135,000) | (135,000) |
| Payrolls & Employee Related Costs | | NP | NP | NP | - | - | - | - | - | - | - | (103) | (103) | - | (258,124) | (253,224) |
| Selling, General & Administrative Expenses | | NP | NP | NP | 1,177 | (1,903) | (726) | - | - | - | - | - | - | 4,901 | (198,081) | (198,081) |
| Subtotal - Operating Activity | | NP | NP | NP | 1,177 | (4,204) | (3,027) | - | - | - | - | (103) | (103) | 4,901 | (591,205) | (586,305) |
| **Other Activity** | | | | | | | | | | | | | | | | |
| Repayment from/Advance to Affiliates | | NP | NP | NP | - | - | - | - | - | - | - | - | - | - | - | - |
| PPP Loan | | NP | NP | NP | - | - | - | - | - | - | - | - | - | - | - | - |
| Bad Debt | [e] | NP | NP | NP | - | - | - | - | - | - | - | - | - | - | (1,347,289) | (1,347,289) |
| Bill Adjustment | [e] | NP | NP | NP | - | - | - | - | - | - | - | - | - | 16,405 | (1,678,117) | (1,661,712) |
| Unidentified | | NP | NP | NP | 12,352 | (1,500) | 10,852 | - | - | - | - | - | - | 45,510 | (773,800) | (728,290) |
| Subtotal - Other Activity | | NP | NP | NP | 12,352 | (1,500) | 10,852 | - | - | - | - | - | - | 61,915 | (3,799,206) | (3,737,291) |
| **Total Cash Activity** | [f] | NP | NP | NP | 1,408,552 | (17,263) | 1,391,288 | 2,028,071 | (73,922) | 1,954,149 | 1,993,045 | (123,199) | 1,869,846 | 1,989,476 | (7,734,950) | (5,745,474) |
| Cash at End of Year - Surplus/(Deficit) | [g] | | | NP | | | 1,391,288 | | | 3,245,437 | | | 5,215,284 | | | $ (530,191) |
| *Year over Year Cash Change %* | [g] | | | | | | | | | 140% | | | 56% | | | -110% |

### YEARS IN SCOPE

| CASH ACTIVITY CATEGORIES | | 2019 SOURCES | USES | NET | 2020 SOURCES | USES | NET | Jan - Apr 2021 SOURCES | USES | NET | Total SOURCES | USES | NET |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash at Beginning of Year per QB - Surplus/(Deficit) | [b] | | | $ (530,191) | | | $(4,994,984) | | | | | | NP |
| Discrepancies between QB and Sage | [b] | | | | | | 8,235,908 | | | | | | 8,235,908 |
| Cash at Beginning of Year per Sage - Surplus/(Deficit) | | | | | | | $ 3,240,924 | | | $ 905,716 | | | $ 8,235,908 |
| **Capital Raising Activity** | | | | | | | | | | | | | |
| Non-insider Noteholders | | - | (1,498,023) | (1,498,023) | 502,100 | (2,629,917) | (2,127,817) | - | (194,595) | (194,595) | 518,295 | (5,580,424) | (5,062,128) |
| Insider Noteholders: | | | | | | | | | | | | | |
| Devaney & Family Members | | - | (4,100) | (4,100) | - | (8,600) | (8,600) | - | (26,200) | (26,200) | - | (45,520) | (45,520) |
| Pierce & Family Members | | - | (285,000) | (285,000) | - | (261,938) | (261,938) | 750 | (16,875) | (16,125) | 750 | (791,813) | (791,063) |
| Harris & Family Members | | - | (51,970) | (51,970) | 60,000 | (16,611) | 43,389 | - | (188) | (188) | 60,000 | (292,749) | (232,749) |
| Subtotal - Capital Raising Activity | [c] | - | (1,839,093) | (1,839,093) | 562,100 | (2,917,066) | (2,354,966) | 750 | (237,857) | (237,107) | 579,045 | (6,710,505) | (6,131,460) |
| **Floorplan Lending Activity** | | | | | | | | | | | | | |
| Non-Devaney related Entities | | 2,126,579 | (3,863,994) | (1,737,415) | 38,341,218 | (37,315,017) | 1,026,200 | 8,662,891 | (8,478,263) | 184,628 | 56,435,356 | (51,419,802) | 5,015,555 |
| Devaney related Entities | [d] | 14,105 | (630,861) | (616,756) | 111,381 | (1,407,962) | (1,296,582) | 17,731 | (9,867) | 7,864 | 161,153 | (2,122,790) | (1,961,638) |
| Subtotal - Floorplan Lending Activity | | 2,140,684 | (4,494,855) | (2,354,171) | 38,452,598 | (38,722,979) | (270,381) | 8,680,622 | (8,488,130) | 192,492 | 56,596,509 | (53,542,592) | 3,053,917 |
| **Operating Activity** | | | | | | | | | | | | | |
| Legal & Financial Professional Fees | | - | (126,213) | (126,213) | - | (149,262) | (149,262) | - | (289,262) | (289,262) | - | (702,039) | (702,039) |
| Payrolls & Employee Related Costs | | - | (35,243) | (35,243) | 663 | (363,403) | (362,740) | - | (83,545) | (83,545) | 5,564 | (740,417) | (734,854) |
| Selling, General & Administrative Expenses | | - | (160,155) | (160,155) | - | (178,527) | (178,527) | 262 | (28,138) | (27,876) | (470) | (566,804) | (567,274) |
| Subtotal - Operating Activity | | - | (321,611) | (321,611) | (1,246) | (691,192) | (692,438) | 262 | (400,945) | (400,683) | 5,094 | (2,009,260) | (2,004,166) |
| **Other Activity** | | | | | | | | | | | | | |
| Repayment from/Advance to Affiliates | | - | - | - | (7,955) | (5,928) | (13,883) | 113 | - | 113 | (7,842) | (5,928) | (13,769) |
| PPP Loan | | - | - | - | 52,720 | - | 52,720 | - | - | - | 52,720 | - | 52,720 |
| Bad Debt | [e] | - | - | - | - | - | - | - | - | - | - | (1,347,289) | (1,347,289) |
| Bill Adjustment | [e] | 22,851 | (4,310) | 18,540 | - | - | - | - | - | - | 39,256 | (1,682,435) | (1,643,172) |
| Unidentified | | 371,384 | (339,843) | 31,541 | 1,362,077 | (418,337) | 943,740 | 67,813 | (120,499) | (52,686) | 1,943,270 | (4,689,623) | (2,746,353) |
| Subtotal - Other Activity | | 394,235 | (344,153) | 50,081 | 1,406,842 | (424,265) | 982,577 | 67,926 | (120,499) | (52,572) | 1,943,270 | (4,689,623) | (2,746,353) |
| **Total Cash Activity** | [f] | 2,534,919 | (6,999,712) | (4,464,793) | 40,420,294 | (42,755,502) | (2,335,207) | 8,749,561 | (9,247,431) | (497,870) | 59,123,918 | (66,951,980) | (7,828,062) |
| Cash at End of Year - Surplus/(Deficit) | [g] | | | $(4,994,984) | | | $ 905,716 | | | $ 407,846 | | | $ 407,846 |
| *Year over Year Cash Change %* | [g] | | | | | | | | | | | | |

**EXHIBIT D – SUMMARY OF NOTEHOLDERS' INVESTMENT ACTIVITY**

| ACTIVITY DESCRIPTIONS | | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Unidentified Yr | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Per Debtor's InvestorDatabase** | | | | | | | | | | | | | |
| Principal Activity: | [a] | | | | | | | | | | | | |
| Original Principal Investment | | $ 113,500 | $ 1,338,000 | $ 2,454,500 | $ 645,000 | $ 1,400,000 | $ 1,300,000 | $ 2,436,500 | $ 1,415,000 | $ 2,035,000 | $ 480,000 | $ 80,000 | $ 13,697,500 |
| Add: | | | | | | | | | | | | | |
| Subsequent Principal Investment | | - | 53,000 | 562,500 | 996,000 | - | 800,000 | 576,195 | 545,000 | 1,220,000 | 200,000 | - | 4,952,695 |
| Rollover of Compound Accrued Interest to Principal | | - | - | - | - | 152,706 | 42,926 | 63,856 | 78,692 | 30,760 | - | | 368,939 |
| Less: | | | | | | | | | | | | | |
| Redemption of Investment | | - | - | (20,000) | (226,000) | (289,139) | (125,000) | (333,500) | (236,195) | (426,637) | (1,058,000) | - | (2,714,471) |
| **Principal Balance** | | $ 113,500 | $ 1,391,000 | $ 2,997,000 | $ 1,415,000 | $ 1,263,567 | $ 2,017,926 | $ 2,743,051 | $ 1,802,497 | $ 2,859,123 | $ (378,000) | $ 80,000 | $ 16,304,664 |
| | | | | | | | | | | | | | |
| Interest Activity: | [a] [b] | | | | | | | | | | | | |
| Total Interest Accrued through 12/31/2020 | | | | | | | | | | | | | 9,213,818 |
| Total Interest Paid Out through 12/31/2020 | | | | | | | | | | | | | (8,158,119) |
| **Total Unpaid Accrued Interest as of 12/31/2020** | | | | | | | | | | | | | $ 1,055,699 |
| | | | | | | | | | | | | | |
| **Total Investment Balance, inclusive of Unpaid Accrued Interest as of 12/31/2020** | | | | | | | | | | | | | $ 17,360,363 |
| | | | | | | | | | | | | | |
| **Analytical Review of Interest** | | | | | | | | | | | | | |
| Cumulative Principal Balance at Beginning of Year | | $ - | $ 113,500 | $ 1,504,500 | $ 4,501,500 | $ 5,916,500 | $ 7,180,067 | $ 9,197,993 | $ 11,941,044 | $ 13,743,540 | $ 16,602,664 | | |
| Cumulative Principal Balance at End of Year | | 113,500 | 1,504,500 | 4,501,500 | 5,916,500 | 7,180,067 | 9,197,993 | 11,941,044 | 13,743,540 | 16,602,664 | 16,304,664 | | |
| Average Principal Balance during Year | | 56,750 | 809,000 | 3,003,000 | 5,209,000 | 6,548,284 | 8,189,030 | 10,569,518 | 12,842,292 | 15,173,102 | 16,453,664 | | |
| Weighed Average Interest Rate | | 12.28% | 12.28% | 12.28% | 12.28% | 12.28% | 12.28% | 12.28% | 12.28% | 12.28% | 12.28% | | |
| **Calculated Average Interest** | | - | $ 13,937 | $ 184,742 | $ 552,754 | $ 726,506 | $ 881,664 | $ 1,129,451 | $ 1,466,279 | $ 1,687,613 | $ 2,038,694 | | $ 8,681,641 |
| | | | | | | | | | | | | | |
| **Total Interest Accrued through 12/31/2020** | | | | | | | | | | | | | $ 9,213,818 |
| | | | | | | | | | | | | | |
| **Difference** | | | | | | | | | | | | | $ 532,177 |
| | | | | | | | | | | | | | |
| New Investment Raised | | 113,500 | 1,391,000 | 2,997,000 | 1,415,000 | 1,263,567 | 2,017,926 | 2,743,051 | 1,802,497 | 2,859,123 | | | |
| Calc. Average Interest per Year | | - | 13,937 | 184,742 | 552,754 | 726,506 | 881,664 | 1,129,451 | 1,466,279 | 1,687,613 | | | |
| Interest Coverage % (New Investment/Interest) | | #DIV/0! | 9981% | 1622% | 256% | 174% | 229% | 243% | 123% | 169% | | | |

**EXHIBIT E –TRANSACTIONS WITH POTENTIAL DEVANEY RELATED ENTITIES**

| ENTITIES POTENTIALLY RELATED TO DEVANEY OR THE DEBTOR | 2011 - 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan-Apr 2021 | TOTAL 2015-Apr2021 |
|---|---|---|---|---|---|---|---|---|---|
| **North Shore Auto Auction ("NSAA")** | | | | | | | | | |
| Cash Inflows [a] | NP | $ - | $ - | $ - | $ - | $ - | $ 28,317 | $ - | $ 28,317 |
| Cash Outflows | NP | - | - | - | (62,675) | (624,841) | (1,316,560) | - | (2,004,076) |
| **Net Cash Flows related to NSAA** | **NP** | **-** | **-** | **-** | **(62,675)** | **(624,841)** | **(1,288,244)** | **-** | **(1,975,760)** |
| | | | | | | | | | |
| **Shamrock Auto Brokers** | | | | | | | | | |
| Cash Inflows | NP | - | - | - | 4,111 | 12,242 | 83,064 | 17,731 | 117,148 |
| Cash Outflows | NP | - | - | - | (11,425) | (6,020) | (91,402) | (9,867) | (118,714) |
| **Net Cash Flows related to Shamrock Auto Brokers** | **NP** | **-** | **-** | **-** | **(7,314)** | **6,222** | **(8,338)** | **7,864** | **(1,566)** |
| | | | | | | | | | |
| **Shamrock Motors** | | | | | | | | | |
| Cash Inflows | NP | 4,924 | 3,657 | 3,519 | 1,725 | 1,863 | - | - | 15,688 |
| Cash Outflows | NP | - | - | - | - | - | - | - | - |
| **Net Cash Flows related to Shamrock Motors** | **NP** | **4,924** | **3,657** | **3,519** | **1,725** | **1,863** | **-** | **-** | **15,688** |
| | | | | | | | | | |
| **Total from Potential Devaney Related Entites** | | | | | | | | | |
| Cash Inflows | NP | 4,924 | 3,657 | 3,519 | 5,836 | 14,105 | 111,381 | 17,731 | 161,153 |
| Cash Outflows | NP | - | - | - | (74,100) | (630,861) | (1,407,962) | (9,867) | (2,122,790) |
| **Total Net Cash Flows** | **NP** | **$ 4,924** | **$ 3,657** | **$ 3,519** | **$ (68,264)** | **$ (616,756)** | **$ (1,296,582)** | **$ 7,864** | **$ (1,961,638)** |

***EXHIBIT F - ROBBIN NARRATIVE FOR EXAMINER***

(See attached)

**Shamrock Finance LLC**

**Basic Overview of Business with Sources Uses of Cash**

Shamrock Finance provides floorplan financing to independent car dealerships in the New England area. Primarily its dealers are in Massachusetts, but a small number are in New Hampshire, Connecticut, and Rhode Island. Lines of credit and interest rates are determined by various risk factors and are increased or decreased based on dealer performance.

Interest is charged weekly based on the daily outstanding line of credit being utilized on our standard program.  A 10% curtailment is due at 180 days and payoff by 270 days. Shamrock holds the title on all vehicles it floor-plans until paid.

The more traditional plan charges interest based on the number of days the unit has been on floorplan and is due at the time the vehicle is paid off. It requires a fee be paid at 60 and 90 days along with a curtailment and assesses late fees if the curtailment is not made. Currently, we only have 5 to 7 dealers utilizing this plan. The majority are on the standard plan.

During 2018 we instituted a reserve program.  A reserve is assessed per vehicle and paid at the time of payoff. The amount of the assessment is determined at the time of signup and is adjusted based on the risk we feel the dealer presents and it is adjusted based a dealer's performance.  The goal is to have a reserve equal to 10% of the line they have utilized.  It is designed as an incentive, as the dealer reaches specific benchmarks in reserve balance the weekly interest rate they pay can be reduced.

The reserve is primarily used to protect Shamrock against aged inventory and losses due to default and/or repossession. It is the dealer's money and is carried as contra asset on our financial statement. Since the reserve is a relatively new requirement, not all dealers are currently contributing. We are slowly reassessing those dealers and working with them to participate.

We finance almost exclusively vehicles purchased from the major dealer only auctions. However, we allow for non-auction purchases to be floor-planned, such as dealer trades or private purchases. In these instances, we run a valuation on the unit and a Carfax to ensure clean title and in many cases require they bring the vehicle to our offices to ensure the vehicle is in good condition. An ancillary fee for this process would apply.

Shamrock assesses various ancillary fees. They are as follows:

- NAP Fee – Non auction purchase. This is for vehicles not purchased at a dealer auction.
- Returned payment fee - This is for payments returned by the bank for insufficient funds. It varies weather the return is and ACH or Check and whether it is a first time return or second time.
- Wire Fee – This is to cover the administrative costs of wiring funds to the various auction houses. Cost varies based on number of cars in a single purchase.
- Late Fees – We assess a late fee on any payment that was scheduled but the dealer has requested we hold payment. (*Please note this was programmed in our system to auto assess this based on various factors, however we had to suspend this feature because it was adding it to the outstanding line of credit utilized and making all reporting inaccurate.*)
- Fedex Fees – We charge the dealer a fee if they require a title be sent to them overnight via Fedex. (*The fee covers the cost of the overnight service and allows for extra to cover administrative costs. It is carried as an income account but washes against our Delivery expense carried on our income statement*).
- FF Fees – These are favor fees. If the dealer request something that is outside our requirements, such as going over their line on a temporary basis, or requesting and additional title etc. We will charge them more as a deterrent in requesting favors on a regular basis.

As a normal course of business, we perform lot checks to ensure that all vehicles we floorplan with a dealer are present and accounted for. This if performed at minimum once a month and more often if we feel the dealer has had either a vehicle payment, or a weekly interest payment returned.

We charge a fee for this task that ranges from a standard of $50 and can be upwards of $150 or more if vehicles are missing or our staff needs to go to a different facility such as a repair shop to make sure the vehicle still exists. We draft this payment via ACH.

The weekly interest charged to dealers on our standard plan is done so on Friday's via ACH. Prior to September 2020 it was done on various days based on what was convenient to the Dealer. This was changed in 2020 effective August to being done once a week. Thursday an ACH file is prepared and submitted for Friday settlement based on the dealers outstanding line balance.

A dealer's line balance is reduced by them paying off vehicles that have been sold. To complete the sale, they need a title. To receive the title from Shamrock they much pay for it. We will allow to borrow up to 3 titles at any given time provided we have a check from them or authorization to ACH their account on a specific date either of which must be allowed to be deposited/drafted within 7 days. Dealer must be in good standing to borrow titles.

Forms of payment accepted are cash, wire, check (either the Dealership's or a Bank Check) or ACH.

| Sources of Cash | Payment Method | Comment |
|---|---|---|
| Weekly Line of Credit Fees | ACH | Effective Sept 2021 billing done on Fridays |
| Lot Check Fees | ACH | Every 3 to 4 weeks as checked |
| Payoff of Floorplan Units with assessed ancillary fees and any reserve due | Cash/Check/Wire/ACH/Reserve | Check Deposits done Daily/ Cash Weekly |
| Issuance of Promissory Note | Wire /Check | |
| Sale of Repossessed Units | Wire/check/Cash | |
| Repayment from Affiliate | Wire/Check | |
| **Uses of Cash** | | |
| Floorplan Purchases | Wire/Check | To Auction House/Dlrs/3rd Parties |
| Interest Payments | Check/ Bill Pay/ ACH | Done Montlhly/Qtrly based on Note |
| Trade Payables | Check/Auto Debit/ACH | |
| Payroll & Payroll Taxes | ACH/Check | Payroll Service Paychex |
| NSF payments | ACH/Check | |
| Advances to Affiliate | Wire/Check | |
| Repayment of Notes Payable | Wire/Check | |
| Distributions to Shareholder | Wire/Check | |

**Accounting System:** Shamrock currently utilizes SAGE50. System was purchased in July 2020 and implemented 9/1/2020. Attempted to convert from Quickbooks, however upon review, the records were determined to be incomplete.  It was decided  that the best course of action was to recreate 2020 in order to have complete and accurate records.

Quickbooks is available for review, but its information is incomplete and does not contain every transaction generated by Shamrock. For information prior to 2020 it would be recommended to use the bank statements and Shamrock's database management system for verification.

**Records uploaded to file share:**

- **Detailed General Ledger**: Provided in two files
  - 1/1/20 – 3/12/2021 Pre-petition.
  - 3/13/2021 – present: Post petition A separate company was created in SAGE50 as required by the bankruptcy statues.
- **Tax Returns**: 2016- 2018 have been provided. 2019 is currently being prepared by Verdolino. 2020 we have filed an extension.
- **1099'S:**
  - 1099 MISC INCOME provided for years 2015,2017,2018,2019,2020 – 2016 and years prior to 2015 are in the possession of K. Harris/D. Pierce
  - 1099 INTEREST – provided for years 2015 through 2020. Prior to 2015 are in the possession of K. Harris/D.Pierce
- **Bank Statements**
  - Bank of America: 2014 through May 2017 PDF format. (Scans of individual checks were not included in the statements. (*If cancelled checks were provided, they potentially are in the possession of K. Harris/D.Pierce.*)
  - Leader Bank
    - Operating account: May 2017 to present.  (*Scans of individual checks are included with each bank statement*)
      - 2017-2019-PDF's provided for each month with a excel spreadsheet for the entire year. Transactions have been classified and payments of interest have been extracted onto a separate tab.
      - 2020 to present PDF's have been provided for each month with corresponding excel spreadsheets.
    - Reserve account: Provided in PDF format
    - CD: Provided in PDF format – NOTE: This is a letter of credit for Adesa Auto Auction, documentation has been included.
  - Citizens: An operating account and payroll account were opened in May per the bankruptcy requirements. April statements provided on both accounts. Payroll account
- **Payroll records**: 2021 & 2020. Will need to download 2019 from PayChex only keeps online 2 years so will only be able to go back to mid-2019.
- **Employee List:** Provided for past three years.
- **Cash Deposit Support**: This is an excel spreadsheet that covers from 2019 to present. It tracks the components of the cash deposits. Effective with the start of VJR the procedure was changed. Cash payments were notated and included in the daily CRJ with an entry to undeposited funds. The weekly cash sheet was printed and the bank receipt was attached once deposit complete and recorded in SAGE as a debit to cash and credit to undeposited funds.
- **Note Holder Documentation**:
  - **Investor Database:** This is an excel spreadsheet that contains an individual tab for each note holder detailing the history on their notes, compounding schedules were applicable, how interest would have been paid, contact information, beneficiaries, rates, UCC filings and the status of documentation as received from K. Harris.  A summary tab is provided along with an accrued interest schedule.

- o **Individual Noteholder Documentation:** If provided by Harris documentation will include a promissory note, a security agreement and addendums if applicable.

***EXHIBIT G – SAMPLE INVESTMENT OPPORTUNITY DOCUMENT***

(See attached)

# SHAMROCK FINANCE, LLC

## INVESTMENT

## OPPORTUNITY

# SHAMROCK FINANCE

This summary highlights the key information about the Company and your investment opportunity. This is just a summary, it may not contain all of the information you may need to consider before making your investment decision. You should carefully read all of the information provided to you, ask any questions and then carefully consider the suitability of this investment for yourself.

## THE COMPANY

We started in 2006 as a buy here pay here motorcycle/automobile dealer in the North Shore. Approximately two years later in 2008 ownership made a decision to shift its focus from the retail side of the business to focus all its efforts and resources on the financing side. We were initially capitalized and financed by the owner and have since raised other private financing. The Company has experienced a positive growth and profitability under its current focus.

Shamrock currently offers specialty financing to automobile dealers to help them meet their inventory needs. With the current economy, the Company is presented with more and more business opportunities to lend at great rates. Through this specialized financing and servicing, Shamrock has found a strong profitable niche.

* Our loans perform very well as evidenced by a low repossession rate below 1% over the life of the business.
* We do not just lend to anyone. There is an application and verification process.
* We hold each title in our possession as secured interest and collateral. A title is a legal document which establishes ownership and rights.
* We are in most cases listed with a first lien position on the title.
* We hold and service all our loans.
* We are listed as loss payees on the dealer's insurance policy.
* Every dealer loan is personally guaranteed.
* We have the power of attorney for titles we possess.

## OPPORTUNITY

The Company sees a great growth opportunity. The current economic climate for this type of business is very good and presents us with an opportunity to be more profitable. To accomplish this objective we require additional funds in order to initiate more loans and to extend more credit.

To help make this happen, Shamrock Finance is offering a high rate of interest for the use of your funds. We are able to offer a great rate as our overhead is very low and our niche market allows us to charge more for our services. The result is YOU receive a high interest rate of return on your money and we continue to grow profitably.

SHAMROCK FINANCE (Continued)

## USE OF FUNDS

The proceeds from your loan will be used for the following:

→ To increase lines of credit to existing customers.
→ To extend secured revolving credit to new dealerships.

The proceeds from your loan will not be used to pay for any operating expenses.

## RISK FACTORS

The Company considers the promissory note(s) to you to be a safe risk. Your funds will always be backed by cash in the bank and or, dealer notes receivables or a combination of both. How ever the Company does operate with some risk such as, market risk (a decline in the purchase of used vehicles), competition (competitor offers loans at competitive rates), delinquent loans (loans default and collateral is insufficient to cover the debt), and regulatory risk (government changes usury laws) to name a few. You must decide for yourself.

## SUMMARY OF THE TERMS OF THE LOAN

| | |
|---|---|
| Interest payments | Interest will be paid out either monthly, quarterly, annually, or at maturity depending on which loan program is selected by you. Interest payments will be made on the first business day of the month to the holder of the promissory note of record as of the last day of the preceding month. |
| | Interest will accrue from the effective day of the note. If the effective date is on or before the first of the month, your first payment will be on the first day of the following month. Simple interest will compound no less than annually for notes greater than one year and where interest is not paid out on a monthly or quarterly basis. |
| Principal payments | The holder of the note(s) will be entitled to receive the principal balance of the note upon maturity or may renew the note at the discretion of the Company for an additional term by notifying us at least 90 days prior to maturity. The renewal will be for the same terms. That is if your note is for one, two or three years, then the renewal will be for a second one, two or three year term at the same interest rate. Should you like to renew for different terms then a new note will be required. We will make our best efforts to notify you at least 90 days prior to your note(s) maturity. |
| Prepayment | The outstanding principal balance, accrued and unpaid interest may be prepaid in whole or in part at any time without any penalty or premium. |
| Collateral | The promissory note(s) will be secured by all assets of the Company and the personal guarantee of its managing member. |

# SHAMROCK FINANCE, LLC

Minimum investment $10,000

We are a special purpose finance company. We hold and service all our loans. Proceeds from your investment will be utilized for the purposes herein mentioned. The investment choices are as follows:

| TERM | ANNUAL INTEREST RATE | FREQUENCY OF INTEREST PAYMENTS |
|------|----------------------|--------------------------------|
| 1 Year | 10.00% | Monthly, Quarterly, Annually |
| 2 Years | 11.00% | Monthly, Quarterly, Annually, Maturity |
| 3 Years | 11.50% | Monthly, Quarterly, Annually, Maturity |
| 4 Years | 12.00% | Monthly, Quarterly, Annually, Maturity |

YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS OF THIS INVESTMENT. THIS HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES REGULATION AUTHORITY OF ANY STATE, AND NEITHER THE COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED ON OR ENDORSED THIS INVESTMENT OR THE ACCURACY OR ADEQUACY OF THIS LITERATURE.

THE NOTES OFFERED HEREBY MAY NOT BE RESOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO US THAT SUCH REGISTRATION IS NOT REQUIRED.

***EXHIBIT H – SELECTED DOCUMENTS OBTAINED FROM THE INTERNET
CONCERNING NSAA***

(See attached)





# *MOVING THE NEEDLE IN FLOORPLANNING*



## MEMBER LOGIN

Username

Password

Remember

LOGIN NOW

## WELCOME TO
# SHAMROCK FINANCE

At Shamrock Finance we have strived to create an innovative approach to the floor plan business. We have always believed that keeping our programs simple so it provides our Dealers with an efficient and cost effective manner to manage their inventory and cash flow simultaneously.

We offer inventory financing options that make Shamrock unique in the industry. These options provide our Dealers more flexibility than our competitors.

The key to our success is transparency, no hidden or added fees. Our goal is partner with our Dealers so they succeed. Contact us today to see how we can help you succeed!

One way that makes Shamrock Finance unique and assists our Dealers is that we own an auto auction. This allows our Dealers to both, sell old aged units as well as supplement their inventory. Because we are a smaller auction we are able to provide personalized service to our Dealers and all the focus of our Buyers is on your vehicle.

We are on Edgepipeline so your inventory is being viewed by buyers across the country.
Visit us at www.theauctionwired.com or call us at 978-356-2427



978-468-0 www.shamrockfinance.com

# About

The Auction Wired (formerly North Shore Auto Auction),  a dealer only auction.

We carry  a wide variety of inventory with vehicles at every price point providing dealers with many options!

We receive inventory from some of the premier dealerships on the North Shore and New Hampshire including

Land Rover of Peabody, Acura of Peabody, Hilltop Chevrolet and many more.

We have the lowest buyer fees in the area.

Come join us online at edgepipeline.com or theauctionwired.com.

Auction day is Tuesday at 2:00 pm

9 Turnpike Rd Ipswich Ma 01938.

Call 978-356-2427 for information

See you then!

# Staff Directory

**Kevin Devaney**
Owner

P: 978-356-2427
E: theauction9@...




Inventory


Events


Online Sales


Reports

## Featured Vehicles

There are no featured vehicles at this time.

## Upcoming Events

No Events currently scheduled

See more

## Welcome to North Shore Auto Auction

**Come to our next auction, October 20, 2020**

**at**

**2:30pm**

**Don't miss out on Green Light ready cars!!**

**See you there.**

Please note we are monitoring Massachusetts COVID guidelines daily.

We will make adjustments as necessary to remain in compliance.

The safety of our customers is our first priority!

Check back often for updates to our inventory.

Location (click on the map to get directions)



 Get Directions    ✉ Contact Us

📞 978-356-2427

 Kevin Devaney





# Kevin Devaney

President at Shamrock Finance LLC President at North Shore AA (The Auction Wired)

Greater Boston · 500+ connections

Join to Connect

Shamrock Finance LLC

---

## About

Shamrock Finance is a non-corporate innovative automotive floor planning company that provides capital to used car dealerships in order for them to not only create an inventory but also better manage their cash flows.

---

## Articles by Kevin

## THE ROAD AHEAD

**EXHIBIT I – LIST OF DOCUMENTS PROVIDED BY SOURCES OF PRODUCTION:**

1. Documents Produced by Victoria Robbin, CFO at Shamrock Finance LLC
   1) Bank Statements:
      - Bank of America #0348 – January 2014 through June 2017 (Missing November 2015)
      - Leader Bank Operating #1797 – April 2017 through April 2021
      - Leader Bank Reserve #3952 – December of 2019, September, October and December of 2020, January, March and April of 2021
      - Leader Bank CD #6104 – March through December 2020, January through March 2021
      - Citizens Operating #1712 (DIP Account) – April 2021
      - Citizens Payroll #1852 (DIP Account) – April 2021
   2) Noteholder Information
      - Noteholder Investor Database
      - Individual Noteholder Documents
   3) Payrolls
      - Cash Requirements for June 2019 through May 2021
      - Payroll Journal for June 2019 through May 2021
      - Employee List
   4) Tax Returns
      - Federal Tax Returns for 2016, 2017 and 2018
   5) Access to Debtor's Accounting System
      - QuickBooks – December 2014 through January 2021
      - SAGE50 – January 2020 through April 2021
   6) Other Miscellaneous
      - Cash Deposit Support in Excel file, containing periods of January through December 2019, February through December 2020, January through June 2021
      - 1099's forms in PDFs, for January 2015 through December 2020
      - Narrative for Examiner
2. Documents Produced by the Debtor's tax accountant, Verdolino & Lowey LLC ("V&L")
   - Draft federal tax return for 2019
   - Various working papers
3. Documents Produced by David Pierce as of July 12, 2021, including:
   - Email from Kevin Devaney to David Pierce and Keith Harris dated December 1, 2014
4. Documents Produced by Keith Harris as of August 12, 2021, including:
   - 1099 shamrock 2015
   - 1099 shamrock 2018
   - 1099 shamrock 2019.
   - Shamrock 1099 prof fees15
   - Shamrock 2012 year end
   - Shamrock 2013, 2014 year end